Reversed and Rendered and Opinion filed July 31, 2003









Reversed and Rendered and Opinion filed July 31, 2003.

 

In The

 

Fourteenth Court of Appeals

____________

 

NO.
14-01-01104-CV

____________

 

IKON OFFICE SOLUTIONS, INC.,
Appellant

 

V.

 

STEVEN EIFERT, Appellee

 



 

On
Appeal from the 215th District Court

Harris County, Texas

Trial
Court Cause No. 97-61183

 



 

O
P I N I O N

A
jury found in favor of appellee Steven Eifert on his common law fraud claim
against appellant IKON Office Solutions, Inc. 
The jury awarded $2 million dollars in actual damages and $2 million
dollars in punitive damages, and the trial court rendered judgment on the
verdict.  On appeal, IKON presents six
issues challenging the legal and factual sufficiency of the evidence supporting
the affirmative findings of fraud, actual damages and punitive damages, and the
negative findings on IKON=s defenses of waiver and ratification.  Concluding there is no evidence to support
Eifert=s
fraud claim, we reverse and render judgment Eifert take nothing.








FACTUAL
BACKGROUND

This
case arises out of IKON=s 1996 acquisition of Global Services, Inc., a Houston based
office products dealership, with sales and leasing interests in the Texas Gulf
Coast area.[1]  IKON is a nationwide office products
distributor.  In terms of distributors
(as opposed to integrated manufacturers like Xerox), Global was IKON=s
largest Houston competitor in 1995. 
Eifert owned virtually all of Global=s common stock.

The
acquisition was structured as a sale/merger in which IKON acquired Eifert=s
stock in Global in exchange for payment to Eifert of an amount of IKON=s
publicly traded stock valued at $35,838,799 and other consideration.[2]  The transaction was accomplished by means of
two contracts: (1) a APlan and Agreement of Reorganization@
(the AAcquisition
Agreement@) governing IKON=s acquisition of Global=s stock and (2) an AEmployment and Non-Competition Agreement@
(the AEmployment
Agreement@) governing Eifert=s role with IKON after the acquisition.








The
negotiations leading up to the acquisition spanned several months.  In late 1995, IKON designed an acquisition
strategy called AOperation Preemptive Strike,@ intended to preempt acquisition of copier dealers by
competitors.  At the time, IKON was in
transformation from being a roll-up company, which acquired dealerships and let
them continue operations as essentially independent units competing against
each other, to being an integrated operating company under one market
president.  Under AOperation
Preemptive Strike,@ IKON gave a target company Aa window of opportunity@ to join the IKON organization. 
As explained by IKON president Kurt Dinkelacker, IKON was going to start
looking more like an integrated operating company, and Ait
would be very difficult to bring additional copier dealerships into the fold
once we had decided who was going to run a given marketplace.@

In
October 1995, Dinkelacker called Eifert to ask whether Eifert would be
interested in selling Global.  According
to Eifert, Dinkelacker said Eifert=s decision would determine how the Houston market place would
be run.  Dinkelacker did not tell Eifert
IKON was transforming its operating structure. 
Dinkelacker came to Houston to meet with Eifert.  At that meeting Eifert told Dinkelacker he
wanted a challenging career for himself and his employees, and Dinkelacker
assured Eifert his requirements would be accommodated.  At trial, Dinkelacker also stated he made a
commitment to Eifert that Global would be a stand-alone company for two
years.  The 1995 meeting concluded with
Dinkelacker telling Eifert to expect a call from Mike Dudek, IKON=s
vice-president of acquisitions.  In
November, 1995, Eifert wrote Dudek to inform Dudek that Global=s
attorney, William York, would be handling both the estate tax planning and the
documentation of the transaction if it proceeded.

Dudek
met with Eifert in Houston in early January 1996.  According to Eifert, Dudek offered Eifert the
presidency of IKON=s Houston marketplace in the copier division, a position that
involved Aheading up@ Global and the eight or nine Houston-area IKON copier dealers
that were then reporting to Charlie Hollis as president.  Eifert agreed to a price of $42 million, a
price he found acceptable if they could Aget some other matters arranged.@

On
January 24, 1996, IKON sent Eifert a letter of intent incorporating the $42
million purchase price, and Eifert signed and returned the letter.  Dudek then called to say Galen McClusky,
president of IKON=s central region and the man who would be Eifert=s
boss after the sale, would stop by Houston to visit with Eifert.








Around
the same time, Dudek, McClusky, and Hollis were in Hawaii attending a meeting
of IKON executives.  While on a sailboat,
Dinkelacker told Hollis and McClusky to go Abelow decks@ to discuss the potential acquisition of Global.  Hollis asked how the acquisition would affect
his existing position as president of IKON Office Products for Houston.  According to Hollis, Dinkelacker said, A[D]on=t
worry about it, you are going to run Houston for us and everything [sic] is
going to end up working for you.@  Hollis assumed Eifert
was just going to take his acquisition money and leave.  Eifert was not told about the offer to
Hollis.

Shortly
after the meeting in Hawaii, McClusky met with Eifert in Houston.  According to Dinkelacker, McClusky had to
insure that Eifert=s Ajob description would fit into the overall organizational
structure of the central region.@  McClusky had to Aput
together the original operational view of what Mr. Eifert should be doing.@  Eifert testified he reiterated to McClusky
the non-negotiable aspects of the job description.

A
few days later, Dudek called Eifert and told him to go to Kansas City to
negotiate Eifert=s job with McClusky. 
According to Eifert, the Kansas City meeting culminated in Eifert=s
being offered the position of CEO of Texas. 
Eifert testified McClusky agreed that being CEO meant Eifert (1) would
be Aboss
of all the [IKON] Office Products in the state,@ (2) would report directly to McClusky and have authority over
the district dealerships, and (3) would retain his job description as president
of Global Services.  McClusky called
Dinkelacker on a speaker phone to advise him of the agreement.  At trial, Dinkelacker confirmed he had
received the call from McClusky, and recalled that an agreement had been
reached.  Dinkelacker was Apretty
sure@
they did not tell him the specifics of the agreement.








A
few days after Eifert returned to Houston, Dudek called again.  According to Eifert, Dudek said Eifert could
not be full CEO of Houston because IKON was in mid-fiscal year and a change in
revenue reporting structure would affect their bonus programs.  Eifert 
therefore could not have immediate responsibility for sales and service,
but he would have responsibility for all administrative, non-revenue
functions.  Eifert would remain president
of Global with both revenue and non-revenue authority.  Eifert accepted.  He stressed this was just for the Atime
being,@
and stated he did not mind Ahaving to earn [his] stripes.@  After  later learning how other=s
presidents= budgets and bonuses and his own compensation package were set
up, Eifert determined placing him in charge of revenue in mid-fiscal year would
have had no effect on IKON=s bonus programs.

On
February 15, 1996, Eifert wrote McClusky to summarize their discussions and
agreements.  Eifert stated he would carry
dual titles:  president of Global and CEO
of Texas. As Global=s president, Eifert would be responsible for all aspects of
Global.  As CEO of Texas, Eifert=s
Ainitial
function@
would be to take executive and administrative responsibility for all
non-revenue producing areas.  He
confirmed that his career path objective was the eventual combining of revenue
producing areas with responsibility for administrative (non-revenue producing)
operations under the single position of CEO of Texas.  He sought eventually to abandon the Astaff
support@
position on an organizational chart for a direct report position between
McClusky and the various dealership principals. 
Eifert emphasized that mutual understanding of his career path objective
was of vital importance to him.  Eifert
closed by requesting, APlease let me know if any one of the responsibilities, goals or
conditions outlined here are not in keeping with your recollection of our
agreement.@

Neither
McClusky nor Dudek responded to the letter. 
Larry Kludt, IKON=s human resources director, talked to Eifert about the letter
twice, and, according to Eifert, Athere was no discrepancy either time.@  Kludt met with Eifert, made notes on a copy of
the letter, underlined the sentence referring to a single position of CEO of
Texas, and wrote, AOriginal offer prior to Dudek phone call.@  Another note on the same page indicates, AMarketplace
Presidents report to Galen [McClusky] for revenue and to Steve [Eifert] for
non-revenue.@








On
February 27, 1996, Eifert and his assistant, Bill Green, participated in a
telephone conference regarding the letter. 
According to Green=s notes of the conference, McClusky stated, AI
don=t
really have a problem with the letter as Steve and I discussed this before he
wrote it.  There are issues here but
mostly they deal with timing.@  At trial McClusky
testified his comment referred to operational issues.  Green also reported McClusky as saying, AI
agree to everything in the letter but a timeline is needed.@  McClusky testified he was not saying anything
about CEO for Texas.  According to Green=s
notes, Dinkelacker twice referred to the necessity for Global to have credible
earnings.  Dudek concluded the conference
by stating he would execute the employment contract based on what had been
discussed and send it to Eifert for review. 
When Eifert did not hear anything for six weeks, he sent a letter on
April 16, 1996, effectively terminating the process.

Within
a few days, IKON contacted Eifert, and on April 25, 1996, the parties held
another conference call.  IKON promised
to send the following day the job description it had promised in February, and
Kludt subsequently forwarded a draft position guide.  Kludt described Eifert=s
duties as President of Global through September 1997 and concurrently ACEO
Texas@
with responsibility Afor the administrative functions and non-revenue producing
operational and logistical functions of all IKON dealers=
operations in Texas.@  Kludt invited Eifert to
make any modifications as Eifert saw fit.

Larry
Baty, a certified public accountant and a Global consultant, responded by
letter, mentioning, among other things, that the time period (which was less
than the two years previously discussed) would not allow Eifert Ato
keep his commitment to his employees to work their way into the IKON system.@  In the same paragraph, Baty stated Eifert Awould
like to have the same authority, accountability and responsibility given to
other CEO=s [sic] of IKON States.@  

On
May 7, 1996, the parties again held a conference call, reviewing Baty=s
letter, paragraph by paragraph.  Notes of
the conversation indicate discussion of the time period, but not the
responsibility attached to the CEO position.








On
May 10, 1996, Bill Brady, IKON=s attorney, submitted a revised job description to Eifert.  In the accompanying letter, Brady represented
he had Areviewed
all of the materials [Eifert] sent, as well as my notes of the various
conversations.  I also confirmed with
Galen [McClusky] his commitment to you. 
It is my belief that we are now all working from the same page.@  In the section relating to specific
commitments, Brady had included a phrase indicating revenue producing functions
would remain with other Texas operating companies, Afor
the time being.@[3]  With the exception of a
change in the time period through which Eifert=s responsibilities were to run, Eifert=s
responsibilities were the same as those ultimately incorporated into the
Employment Agreement.[4]  Brady asked Eifert to review the job
description and Aprovide any revisions which you feel better clarify your
position with IKON.@  Following this
correspondence, Eifert and IKON negotiated additional financial aspects of the
sale, resulting in the adjusted purchase price of $35,838,799 of IKON stock.

During
the period IKON was negotiating with Eifert, it was presenting a somewhat
different picture of Eifert=s proposed position to IKON marketplace presidents.  In addition to the discussion in Hawaii,
Hollis testified about another meeting in Minneapolis, attended by three other
IKON presidents from Texas and Louisiana. 
At that meeting, Hollis specifically asked whether they would report to
Eifert, and McClusky responded, ADon=t worry about it, you=re going to continue to report to me.@  According to Hollis, it was clear the
marketplace presidents were not going to report to Eifert at all.  McClusky explained to Hollis that, to get the
acquisition for IKON of one of the last and biggest Canon dealerships, Eifert
had to have a significantly more important sounding title than all the rest of
the presidents in Texas and Louisiana.








The
acquisition closed on May 31, 1996, with the execution of the Acquisition
Agreement and the Employment Agreement. 
In addition to the IKON stock, the consideration included  $1 million cash for a non-competition
agreement, $2 million in bonuses for Global employees, retirement of debt, and
transfer to Eifert of some real property owned by Global.

The
Acquisition Agreement contains, among other provisions, a statement that it Aconstitutes
the entire agreement concerning the subject matter hereof.  No modification or waiver hereof shall be
binding upon any party unless in writing and signed by or on behalf of the
party against which the modification or waiver is asserted.@  The Employment Agreement is referenced in,
and attached to, the Acquisition Agreement.

The
Employment Agreement provides in part that IKON shall employ Eifert Aas
President of Global and Chief Executive Officer (ACEO@) of the IKON Division=s Texas operations, with duties as set forth on [the attached
job description], for a period . . . continuing until May 31, 1998 unless
sooner terminated as hereinafter provided.@  The job description
also reflects that Eifert was given the dual job title of CEO of Texas and
President of Global Services.  Under the
job description, Eifert was to be A[r]esponsible for the P&L for Global Services through 5/31/98
unless otherwise determined by mutual agreement between the IKON Central Region
President and Steve Eifert.@  He was also to be A[r]esponsible
for the administrative functions and non-revenue producing operational and
logistical functions of all IKON dealers= operations in Texas through 5/31/98 unless otherwise
determined by mutual agreement. . . .@  Eifert was to have
responsibility for establishing and managing a regional administrative service
center (ASC) for Texas and a marketing administrative center (MAC) for the
Houston marketing area.  In addition, the
job description provides:

As
both CEO of Texas and President of Global, Employee will report directly to the
Central Region President of IKON. 
Employee shall have both executive and administrative responsibility for
non-revenue producing administrative areas for the state of Texas.  All revenue producing functions, including
but not limited to equipment sales, service and after-market sales outside of
Global, shall remain for the time being with the other Texas IKON operating
companies.

 








The
Employment Agreement, to which the job description was attached, contains
clauses stating it contains the entire agreement between the parties;
supercedes prior employee and compensation agreements; and can be changed,
modified or extended only in writing.  It
also contains a provision stating, A[N]o commitments have been made relative to bonuses, guarantees
or any other special provisions, except as specifically identified herein.@

In
his first week on the job, Eifert tried to discuss his job position and
reporting requirements with Hollis. 
Hollis knew nothing about having to report to Eifert.  According to Eifert, when he showed Hollis the
job description, Hollis was shocked. 
Hollis also had not been told the MAC would be reporting to Eifert.

Eifert
testified none of the other Texas presidents had been told to report to him,
and when he requested budget information, his request was refused.  When he asked for information from the
marketplace presidents, he was rebuffed or ignored, with one market place
president telling Eifert to Abug off.@  Eifert was unable to
obtain information regarding inventory levels, insurance programs, advertising
plans, logistical data, or warehousing. 
Eifert complained to McClusky and others about his inability to obtain
information.[5]








By
mid-September 1996, McClusky was concerned about Hollis=s
and Eifert=s inability to work together as a team.  McClusky directed a memorandum to them,
stating AI
know it is tough to bring two companies together in Houston.  However, it is, more specifically, your
job do so.@

In
a quarterly status report dated September 19, 1996, Eifert informed McCluksy he
was uncomfortable with the lack of any progress in regard to his
responsibilities as CEO of Texas. 
McClusky responded Eifert needed first to Afix@ Houston, but did not indicate how.

On
September 25, 1996, McClusky distributed a memorandum to region presidents and
central region staff, in which McClusky discussed what to do and not do during
IKON=s
name change and consolidation into one marketplace.  McClusky cautioned against trying to change
the structure of the sales force or the persons having responsibility for the
bottom line during the following twelve months. 
He advised, A[I]t is very important that you work on consolidation of
Service and the transition of Administration to the ASC and the development of
the MAC as your #1 Priority.@

On
September 30, 1996, Eifert responded to McClusky, stating he had been
re-examining the decision to maintain separate companies and had reached the
conclusion Athat the two dealerships should be formed into one entity.  The timing of a combination is also critical
in my opinion since IKON Corporate is planning a national advertising blitz
beginning in January 1997.@  Eifert concluded by
recommending the creation of a fourth marketplace with Hollis as
President.  The proposed marketplace Awould
consist of all dealerships not included in the three major metropolitan
marketplaces of Dallas/Fort Worth, Austin/San Antonio and Houston.@  Eifert opined, AWe keep the experience and value of the management team within
the IKON family with a minimal level of disruption for [Hollis] and his senior
staff.  The creation of this marketplace
would not require that they move out of Houston, just out of Transco Tower.@  There is no indication Eifert sent a copy of
this memorandum to Hollis.

On
October 3, 1996, Eifert sent a memorandum to Hollis, with a copy to McClusky,
further delineating Eifert=s proposal.  Included
were the following elements:








$          Combine the plans for the two entities
into a single marketplace plan with an executive incentive plan that supports
the achievement of the marketplace goals instead of the competitive goals of
the two companies.

$          Eliminate the duplication of sales and
service expenses in areas where there are no distinct differences in products
or services.  These areas would include
Oce` (High Volume), Digital, Color and FM. 
I am proposing that one sales force be created for each of these four
areas (as opposed to a sales force for each in each dealership) and that all
revenue, earnings and cash flow be split 50/50 between the dealerships with all
numbers to be applied to the joint marketplace plan and incentive program.

Eifert
further proposed Global would house and manage the digital and color groups and
IKON-Houston would manage the Oce` high volume specialists and FM efforts.  Eifert closed by indicating he was sending
the proposal to Hollis a few days in advance of McClusky=s
receiving a copy.

McClusky
subsequently scheduled a meeting in Houston on November 13, 1996.  When Eifert learned of the meeting, he wrote McClusky to
suggest that the meeting would be an opportune time to discuss the CEO Texas
position.  Eifert also reminded McClusky
that the agreement with IKON granted Eifert control over all of Global=s operations and that, if McClusky
were going to seek some kind of change regarding Eifert=s control, Eifert wanted to discuss
the matter first.  McClusky responded by
indicating there would be two parts to the meeting: (1) identifying all areas
of conflict, and (2) establishing a structure to solve the problems.

Shortly before the meeting on November 13, 1996,  Eifert again asked McClusky about the subject
matter of the meeting.  McClusky
responded that IKON was going to change Global=s name and reassign various of its
departments to IKON executives within Hollis=s organization.  If Eifert did not go along with the changes,
he was Agoing to sit in [his] building by
[himself].@








When the meeting convened, McClusky stated the purpose of the
meeting was to Acreate one company and one name in Houston and we will be here
as long as it takes to accomplish this.@ 
Global=s service department would be severed
and given to Hollis.  More than 150 of
Global=s former employees would be
transferred out of Eifert=s control.  Global=s color copier and digital sales
groups consisting of another 25 employees would also be transferred to
Hollis.  Global was told to dispense with
its systems integration unit.  Finally,
the Oce` product line was taken from Global and reassigned.

Shortly after the November meeting, Eifert complained to
Dinkelacker in person about McClusky=s decision and pointed out that
promises were not being fulfilled. 
Dinkelacker did not respond immediately, but needed to speak with
McClusky first.

Eifert was soon summoned to a meeting with Dinkelacker,
McClusky, and Hollis in Valley Forge. 
McClusky announced that a position entitled EVP (executive vice
president) was going to be open for competition, and Dinkelacker indicated that
neither Eifert nor Hollis was likely to be considered for the position.  Although the title was different, Eifert believed
it was the position he had been promised the opportunity to earn.  According to Hollis, when Eifert was
temporarily out of the room, Dinkelacker reconfirmed to Hollis his earlier
promise that Hollis would be president of the combined Houston market.  The meeting culminated with Eifert and Hollis
signing an agreement modifying aspects of the relationship between Global and
IKON Houston.  Eifert felt he would be
fired if he did not sign; Hollis believed not signing would have affected his
career negatively.

In March 1997, IKON underwent an organizational change that
created 13 districts out of the then existing four or five regions.  Eifert now reported to Steve Koinis, who was
President and CEO of Texas-Louisiana. 
Under the new organization, Koinis=s 
job was the same one Eifert believed he had the right to earn.  As soon as Koinis took over, the ASC reported
directly to Koinis.  Koinis, appointed to
his position by Dinkelacker, had never heard of the title CEO of Texas for
non-revenue and administration.  Neither
Dinkelacker nor McClusky had briefed Koinis on what Eifert=s position was.








In June, 1997, Dan Boylan assumed Koinis=s position, and Williams was removed
as vice president of the ASC.  Boylan
subsequently met with Eifert and showed Eifert two proposed organizational
schemes.  In one, Eifert would have been
president of the Houston marketplace, but the position of a former Global
employee would have been eliminated.  In
the other, the Global employee would have retained his position.  Both plans eliminated the positions of four
other Global employees.  Eifert told
Boylan he intended to resign, and three of his former Global executives were
terminated shortly thereafter.

PROCEDURAL
BACKGROUND

Eifert
sued IKON, Dinkelacker, and McClusky. 
Following a two-week trial, the case was submitted to the jury on
statutory fraud, common law fraud, and securities fraud.  The charge also contained questions on IKON=s
defenses of waiver and ratification.  The
jury returned a ten-to-two verdict.  The
jury answered Ano@ on all three fraud claims against Dinkelacker and McClusky, Ano@
on the statutory fraud and securities fraud claims against IKON, and  Ayes@ on the common law fraud claim against IKON.  In addition, the jury found clear and
convincing evidence of fraud.  The jury
awarded $2 million in actual damages and $2 million in punitive damages.  Finally, the jury found against IKON on its
defenses of waiver and ratification.

In
six issues, IKON challenges the legal and factual sufficiency of the evidence
supporting these findings.  In issue one,
IKON challenges the sufficiency of the evidence supporting the jury=s
answer of Ayes@ to the question on common law fraud; in issue two, the
sufficiency of the evidence to support the award of $2 million in actual damages;
in issue three, the sufficiency of the evidence to support a finding of clear
and convincing evidence of fraud; in issue four, the sufficiency of the
evidence to support the award of $2 million in punitive damages; in issue five,
the sufficiency of the evidence to support the answer of Ano@
on IKON=s
affirmative defense of waiver; and in issue six, the sufficiency of the
evidence to support the answer of Ano@ to IKON=s affirmative defense of ratification.








We
conclude the evidence was legally insufficient to support the jury=s
answer of Ayes@ to common law fraud and sustain IKON=s
issue one.  Accordingly, we need not
address  the remaining issues.

DISCUSSION

I.  Standard of Review

A.  Legal Sufficiency

When
a party challenges the legal sufficiency of the evidence supporting an adverse
finding on an issue on which it does not have the burden of proof, that party
must demonstrate on appeal that there is no evidence to support the adverse
finding.  Price Pfister, Inc. v. Moore
& Kimmey, Inc., 48 S.W.3d 341, 347 (Tex. App.CHouston
[14th Dist.] 2001, pet. denied) (citing 
Croucher v. Croucher, 660 S.W.2d 55, 58 (Tex. 1983)).  To prevail on a legal sufficiency challenge
to a question on which it had the burden of proof, a party must establish (1)
there was no evidence to support the jury's finding, and (2) the evidence
established a contrary proposition as a matter of law. Schwartz v. Pinnacle
Communications, 944 S.W.2d 427, 431B32 (Tex. App.CHouston [14th Dist.] 1997, no writ).

We
consider all the evidence in the light most favorable to the jury=s
verdict, indulging every reasonable inference in favor of the prevailing
party.  Price Pfister, 48 S.W.3d
at 347 (citing Associated Indem. Corp. v. CAT Contracting, Inc., 964
S.W.2d 276, 285B86 (Tex. 1998)).  We will
sustain a legal insufficiency point when (a) there is a complete absence of
evidence of a vital fact, (b) the court is barred by rules of law or of
evidence from giving weight to the only evidence offered to prove a vital fact,
(c) the evidence offered to prove a vital fact is no more than a mere
scintilla, or (d) the evidence conclusively establishes the opposite of a vital
fact.  Id. (citing  Merrell Dow Pharms., Inc. v. Havner,
953 S.W.2d 706, 711 (Tex. 1997)).  If the
record contains any evidence of probative force to support the jury=s
finding, we must overrule the legal insufficiency point. Id. (citing ACS
Investors, Inc. v. McLaughlin, 943 S.W.2d 426, 430 (Tex. 1997)).








B.  Factual Sufficiency

When
reviewing a challenge to the factual sufficiency of the evidence, we must
examine all of the evidence in the record, both supporting and contrary to the
judgment. Plas‑Tex, Inc. v. U.S. Steel Corp., 772 S.W.2d 442, 445
(Tex. 1989); Marsh v. Marsh, 949 S.W.2d 734, 739 (Tex. App.CHouston
[14th Dist.] 1997, no writ). After considering and weighing all the evidence,
we will sustain the challenge only if the finding is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust. Cain
v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); Marsh, 949 S.W.2d at 739.

II.  Common Law Fraud and the Alleged
Misrepresentations

A.  Legal Principles

To
recover for common law fraud, Eifert had to prove: (1) IKON made a material
representation;  (2) the representation
was false;  (3) when IKON made the
representation, IKON knew it was false or made it recklessly without any
knowledge of the truth and as a positive assertion;  (4) IKON made the representation with the
intention that Eifert act on it;  (5)
Eifert acted in reliance upon the representation; and (6) Eifert suffered injury.  See Johnson & Higgins of Texas,
Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507, 524 (Tex. 1998).  A 
promise to act in the future constitutes fraud only when made with the
intention, design and purpose of deceivingCa promise made with no intention of performing the act.  Spoljaric v. Percival Tours, Inc., 708
S.W.2d 432, 434 (Tex. 1986); see Formosa Plastics Corp. v. Presidio Eng=rs
& Contractors, Inc., 960
S.W.2d 41, 47B48 (Tex. 1998);  T.O.
Stanley Boot Co. v. Bank of El Paso, 847 S.W.2d 218, 222 (Tex. 1992).    Although a party=s
intent to defraud is determined at the time the party made the representation,
it may be inferred from the party=s subsequent acts after the representation is made.  Anderson, Greenwood & Co. v. Martin,
44 S.W.3d 200, 215 (Tex. App.C Houston [14 Dist.] 2001, pet. denied).








Because
intent to deceive or defraud is not susceptible to direct proof, it invariably
must be proven by circumstantial evidence. 
See Anderson, Greenwood, 44 S.W.3d at 215 (citing Spoljaric,
708 S.W.2d at 435).  Although
circumstantial evidence may be used to establish any material fact, Ait
must transcend mere suspicion.@  Lozano v. Lozano,
52 S.W.3d 141, 149 (Tex. 2001) (Phillips, C.J., concurring and dissenting).
Reasoning from circumstantial evidence often involves linking apparently
insignificant and unrelated events to establish a pattern.  See id.  A court, therefore, must not view each piece
in isolation, but in view of all known circumstances.  See id.  Nevertheless, A[l]egally sufficient circumstantial evidence requires a logical
bridge between the proffered evidence and the necessary fact.@  Id. at 152 (citing Joske v. Irvine,
91 Tex. 574, 44 S. W. 1059, 1064 (1898)).

Failure
to perform a contract, standing alone, is no evidence of the promisor=s
intent not to perform when the contract was made, but a circumstance to be
considered with other facts to establish intent.  Spoljaric, 708 S.W.2d at 435; Bank
One, Texas, N.A. v. Stewart,  967 S.W.2d 419, 444 (Tex.  App.CHouston
[14th Dist.] 1998, pet. denied).  Partial performance can negate an intent not
to keep a promise at the time it was made. 
See Stewart, 967 S.W.2d at 445 (holding there was no evidence
party made representations with intent not to perform on note when party
subsequently made payment for five years).

In
addition, a party=s specific disclaimer of reliance on extra contractual
representations may, under certain circumstances, preclude a fraudulent
inducement claim.  See, e.g., Schlumberger
Tech. Corp. v. Swanson, 959 S.W.2d 171, 180B81 (Tex. 1997).  In Schlumberger,
the supreme court held Athat a release that clearly expresses the parties=
intent to waive fraudulent inducement claims, or one that disclaims reliance on
representations about specific matters in dispute, can preclude a claim of
fraudulent inducement.@  Id. at 181.  The Schlumberger court emphasized Athat
a disclaimer of reliance or merger clause will not always bar a fraudulent
inducement claim.@  Id.  In the course of reaching its decision, the
court explained:








The
contract and the circumstances surrounding its formation determine whether the
disclaimer of reliance is binding. . . . 
Because the parties were attempting to put an end to their deal, and had
become embroiled in a dispute over the feasibility and value of the project, we
conclude that the disclaimer of reliance the Swansons gave conclusively negates
the element of reliance.

 

Id. at 179B80 (citations omitted).

The
parties in Schlumberger were attempting to terminate a joint venture
project after they became embroiled in a dispute about the value and
feasibility of the project.  Id.
at 174.  The parties finally agreed
Schlumberger would buy out the Swansons; and, in exchange, the Swansons would
relinquish all rights, claims, and interests in the project and would
specifically release all causes of action, known or unknown, against
Schlumberger.   Id.  The disclaimer read:

A[E]ach
of us [the Swansons] expressly warrants and represents and does hereby state .
. . and represent . . . that no promise or agreement which is not herein
expressed has been made to him or her in executing this release, and that none
of us is relying upon any statement or representation of any agent of the
parties being released hereby.   Each of
us is relying on his or her own judgment and each has been represented by
Hubert Johnson as legal counsel in this matter. 
The aforesaid legal counsel has read and explained to each of us the
entire contents of this Release in Full, as well as the legal consequences of
this Release . . . .@

 

Id. at 180 (emphasis added by supreme court).  The surrounding circumstances noted by the
supreme court included the following: 
the parties (1) were attempting to end their relationship, (2) were Aembroiled
in a dispute,@ (3) were dealing at arm=s length, (4) were represented by highly competent and able
legal counsel during the negotiations over the terms of the release itself, (5)
were knowledgeable and sophisticated business players, and (6) the terms of the
release Ain
clear language . . . unequivocally disclaimed reliance@
on the specific representations of the value of the project, which
representations were the basis for the Swansons= lawsuit.  Id. at
179B80.








With
these principles in mind, we turn now to the contract and the alleged
misrepresentations in the present case.

B.  The Contract and the Alleged
Misrepresentations in the Present Case

1.  The Contract and the Merger Clauses

The
Agreements in the present case contain merger clauses.[6]  The Acquisition Agreement includes a
statement that it Aconstitutes the entire agreement concerning the subject matter
hereof.  No modification or waiver hereof
shall be binding upon any party unless in writing and signed by or on behalf of
the party against which the modification or waiver is asserted.@  The Employment Agreement is referenced in,
and attached to, the Acquisition Agreement. 
The Employment Agreement, to which Eifert=s job description was attached, contains clauses stating it
contains the entire agreement between the parties; supercedes prior employee
and compensation agreements; and can be changed, modified or extended only in
writing.  It also contains a provision
stating, A[N]o commitments have been made relative to bonuses, guarantees
or any other special provisions, except as specifically identified herein.@









Eifert=s
job description was the subject of lengthy and intense dispute and negotiation,
with Eifert being given the opportunity to review and revise the description on
at least two occasions.  Eifert was
assisted by an attorney and an accountant. 
Almost all of the Schlumberger factors are present:  Eifert=s sophistication (he had bought out four other dealerships);
advice from an attorney and an accountant; a contract attempting to put an end
to the dispute at issue (i.e., the scope of Eifert=s
responsibilities); an arm=s length transaction; and a lawsuit based on the very terms
that were in dispute.  See
Schlumberger, 959 S.W.2d at 179B180; see also Yzaguirre v. KCS Resources, Inc., 47 S.W.3d
532, 542B43
(Tex. App.CDallas 2000) (following Schlumberger in case involving
general merger clause), aff=d, 53 S.W.3d 368
(Tex. 2001).  Cf. Fletcher v. Edwards,
26 S.W.3d 66, 76B77 (Tex. App.CWaco 2000, pet. denied) (distinguishing case from Schlumberger
because when Fletchers signed real estate contracts at issue containing Aas
is@
clause, they were not attempting to resolve present dispute about availability
of water, were not represented by counsel, and were not Asophisticated
business players@ as were the Swansons in Schlumberger).

As
noted, the Agreements between Eifert and IKON were freely negotiated by
sophisticated parties and their counsel.[7]  The merger clauses were not
boiler-plate.  A merger clause freely
negotiated by similarly sophisticated parties as part of the bargain in an arm=s-length
transaction has a different effect than a provision in a standard form contract
which cannot be negotiated and cannot serve as the basis of the parties=
bargain.  See Prudential Ins. Co. v.
Jefferson Assocs., 896 S.W.2d 156, 162 (Tex. 1995) (using same criteria to
establish enforceability of Aas is@ clause in agreement).








The
only question in this case is whether the merger clauses in the agreements at
issue are sufficiently broad and specific to conclusively negate the reliance
element of Eifert=s common law fraud claim considering the Employment Agreement=s
detailed provisions regarding Eifert=s job position, titles, responsibilities and duties.  Although the Texas Supreme Court has not
addressed this question since it decided Schlumberger, decisions of
other courts discussing Schlumberger are instructive.  Cases discussing Schlumberger often
involve releases executed in connection with settlement agreements or by
parties ending not only a dispute but also their relationship, a context that
involves policy and judicial economy concerns not present in the instant
case.  See, e.g., Yzaguirre,
47 S.W.2d at 542B43; see also Schlumberger, 959 S.W.2d at 178
(stating Texas law favors and encourages voluntary settlements and orderly
dispute resolution).  Other decisions
referencing Schlumberger involve Aas-is@ clauses in residential real estate transaction documents,
again a fact pattern generally dissimilar to this lawsuit.  See, e.g., The Woodlands Land Dev. Co. v.
Jenkins, 48 S.W.3d 415, 420B22 (Tex. App.CBeaumont 2001, no pet.). 
However, in a very recent decision with facts similar to this case, the
United States Court of Appeals for the Fifth Circuit discussed Schlumberger
and concluded that the merger clauses in the employment contracts before it
were clear and unequivocal disclaimers of reliance, and thus summary judgment
was proper for the defendant on the plaintiffs= common law fraud claim. 
See Armstrong v. Am. Home Shield Corp., No. 02-10596, 2003
WL 21297251, at *5 (5th Cir. June 6, 2003).

In
Armstrong, the plaintiffs John and Dan Armstrong sued defendant American
Home Shield Corp. (AHS), which sells and services home warranty contracts, and
had acquired the home warranty business of the Armstrongs and also hired
them.  Id. at *1.  The plaintiffs= employment agreements included several Asavings
programs,@ and AHS agreed to pay the Armstrongs a portion of the cost
savings accomplished under each program. 
Id.  The plaintiffs
complained that they were not adequately compensated, and sued for breach of
contract, negligent misrepresentation and fraud.  Id. 
The Fifth Circuit affirmed the district court=s
grant of summary judgment in favor of AHS on all claims.  Id. at *5.








With
respect to the fraud claim, the Fifth Circuit discussed Schlumberger and
the provisions in the Armstrongs= employment contracts. 
The merger clause in both provided that A[t]his Agreement shall constitute the entire contract between
the parties and supercedes all existing agreements between them, whether oral
or written, with respect to the subject matter hereof.@  Id. 
The court noted that the clause reflects the parties=
intent to bar later disputes related to the underlying agreements, but Anotably
fails to mention or refer to prior representations.@  Id. (citing U.S. Quest Ltd. v.
Kimmons, 228 F.3d 399, 403 (5th Cir. 2000) (holding that merger clause in
contract superseding all Aprior or contemporaneous agreements, communications or understandings,
whether written or unwritten@ was a valid disclaimer of reliance upon alleged oral
representation that the parties would enter into a second written
contract)).  The Fifth Circuit
nonetheless concluded that the merger clause was a clear and unequivocal
disclaimer of reliance because the contract had provisions addressing the very
subject matter of the alleged representations on which the plaintiffs based
their fraud claim.  Id.[8]

Other
Texas courts of appeals have held that merger clauses less specific than that
in Schlumberger conclusively negated the reliance element of a fraud
claim.  See Starlight,
L.P./Xarin Austin I, Ltd. v. Xarin Austin I, Ltd., No. 03-97-00747-CV, 1999
WL 11213, at *8B9 (Tex. App.CAustin Jan. 14, 1999, no pet.) (not designated for publication)
(concluding that although no-reliance provision in merger clause was not as Aemphatic
as the clause in Schlumberger,@ it was Anonetheless clear and straightforward@
in establishing that plaintiff relied only on representations in commercial
real estate contract for purchase of building); 1900 SJ, Inc. v. Wash. Nat=l
Ins. Co., No. 01-97-00493-CV, 1998
WL 386407, at *5B6 (Tex. App.CHouston [1st Dist.] May 21, 1998, pet. denied)  (not designated for publication) (concluding
that Aas-is@
clause in custom-drafted purchase agreement relating to building precluded
fraudulent inducement claim because, inter alia, parties negotiated the
contract over an extended period of time, plaintiff was represented by
experienced legal counsel and a broker, and transaction was conducted at arm=s
length).








We
conclude it is appropriate to apply Schlumberger in the present
case.  Thus, to the extent Eifert relies
on representations outside the Acquisition and Employment Agreements (including
the job description) to establish his fraud claim, the evidence is legally insufficient
to support that claim.  See
Schlumberger, 959 S.W.2d at 181 (stating disclaimer of reliance
conclusively negates element of reliance).[9]

2.  The Alleged Misrepresentations

Although
in his live pleadings, Eifert set forth several purported misrepresentations,
on appeal he relies only on three:  (a)
Eifert would have a career path beyond mere administrative duties; (b) Eifert
would be CEO of Texas with responsibility for all administrative and non-revenue
functions in Texas; and (c) Global would be a stand-alone company for two
years, with Eifert as president of Global for that period (Athe
stand-alone theory@).[10]  We hold the evidence of each of these alleged
misrepresentations to be legally insufficient to support a claim of fraud,
albeit for different reasons.

a.  A career path beyond mere administrative
duties.  In his appellate brief, Eifert states this
promise in various ways: Aa real executive position with a future within the IKON
organization,@ the Aright to earn revenue,@ and a Acareer path beyond mere administrative duties within IKON.@  Regardless of how the purported promises are
phrased, Eifert relies solely on statements outside the Acquisition and the
Employment Agreements to establish the existence of such promises.  As a matter of law, given the merger clauses
within the Agreements, Eifert cannot rely on these representations to support
his claim of fraudulent inducement.  See
id.; Yzaguirre, 47 S.W.3d at 542B43.








b.
Eifert to be CEO of Texas with responsibility for all administrative and
non-revenue functions in Texas.[11]  Eifert=s
job description provided he would be ACEO Texas@ and would report to the AIKON Central Region President.@  According to the job
description, Eifert had two Aspecific accountabilities@ related to CEO of Texas: (1) to establish and manage the ASC
and (2) to establish and manage the order processing, billing and related
administrative activities for the Houston marketplace (i.e., the
MAC).  Eifert=s
authority under the job description was to (1) A[d]evelop and implement the administrative support and
logistics long range plan for IKON for the state of Texas@
and (2) A[p]rovide
one-over-one sign-off approval relative to the above organizations once
established.@  Under ASpecific
Commitments@ the job description provided:

As both CEO of Texas and
President of Global, Employee will report directly to the Central Region
President of IKON.  Employee shall have
both executive and administrative responsibility for non-revenue producing
administrative areas for the state of Texas. 
All revenue producing functions, including but not limited to equipment
sales, service and after-market sales outside of Global, shall remain for the
time being with the other Texas IKON operating companies. 








The establishment and management of the regional
Administrative Service Center (AASC@) for the state of Texas (merely an issue of timing
but to occur not later than October 1, 1997), as well as the Marketing
Administrative Center (AMAC@) for the Houston marketing areas will, in
coordination with the Central Region President of IKON and the Transformation
Processing Team, in compliance with guidelines established or to be established
and policies of IKON, be part of Employee=s
responsibilities.  The MAC for Houston
shall be located at Global, with the ASC location site still undecided.  However, Employee shall undertake a
feasibility study as to the consolidation of all MAC functions for Texas in
Houston, as well as developing the pros and cons of eventually establishing the
ASC for the state of Texas in Houston.

 








In
support of his theory that IKON, when it signed the Acquisition and Employment
Agreements, did not intend to honor the commitments in the job description,
Eifert sets forth the following evidence of IKON=s pre-acquisition conduct: 
(1) IKON=s not following up on a promise to provide a written job description
until after Eifert sent a letter effectively terminating the negotiations; (2)
pre-acquisition statements by McClusky and Dinkelacker to Texas market
presidents that they would not report to Eifert, that CEO of Texas was a
figurehead position, and that, to acquire Global, it was necessary to give
Eifert a significantly more important sounding title than the rest of the Texas
and Louisiana presidents; (3) McClusky=s testimony he first heard of the position CEO Texas from Dudek
although Eifert contends that is the position McClusky offered Eifert; and (4)
McClusky=s
testimony he had no knowledge of  Eifert=s
job before the acquisition because he (McClusky) was not part of the
acquisition group.[12]  In addition, Eifert offers the following
evidence of IKON=s post-acquisition conduct: (1) certain of IKON=s
personnel never being instructed to report to him and never reporting to him;[13]
(2) Dinkelacker=s testimony he did not know what would fall outside the ASC and
that Eifert would have lost all responsibility as CEO Texas if the ASC started
reporting directly to the regional president;[14]
(3) Eifert=s testimony he was unable to obtain information he (Eifert)
believed was necessary; (4) lack of any organizational chart showing the position
of CEO of Texas; (5) Eifert=s not having been consulted about IKON=s
lease of space in the Transco Tower nor about locating the ASC somewhere other
than in Global Headquarters; (6) Eifert=s testimony he initially had limited authority over the ASC,
and it rapidly became apparent he had no authority; (7) Central Region CFO Dave
Luckner=s
appointment, on Eifert=s recommendation, of Jimm Williams as vice-president of the
Houston ASC; (8) Eifert=s testimony that Steve Koinis, president of the Texas-Louisiana
District in 1997, was unaware of Eifert=s job responsibilities within the title of CEO of Texas
nonrevenue; and (9) Eifert=s not being informed when IKON=s CEO visited Houston in April, 1997.

The
promises regarding Eifert=s position with IKON as set forth in Eifert=s
job description (which was attached to, and referenced in, the Employment
Agreement), related to the non-revenue administrative functions of establishing
and managing the ASC and the MAC.  As
discussed above, given the merger clauses in the Acquisition and Employment
Agreements, Eifert cannot rely on any purported representations outside these
Agreements to support his fraudulent inducement claim.  See Schlumberger, 959 S.W.2d at 181; Yzaguirre,
47 S.W.3d at 542B43.

With respect to the related but different question of whether
IKON, at the time the parties executed the Agreements, never intended to
perform its contractual obligations under these Agreements, there is no
evidence IKON lacked the intent to perform its promises when they were
made.  AAs a general rule, the failure to
perform the terms of a contract is a breach of contract, not a tort.@ 
Crim Truck & Tractor Co. v. Navistar Int=l Transp. Corp., 823 S.W.2d 591, 597 (Tex.
1992).  An exception to the general rule
arises if a party enters into a contract with no intention of performing; that
misrepresentation may give rise to a claim of fraud.  Id.








Here, IKON provided a written job description, which Eifert
found satisfactory.  McClusky=s and Dinkelacker=s pre-acquisition characterizations
of the yet-to-be-defined position do not constitute any evidence that IKON
never intended to honor the job description as it was subsequently drafted.  Similarly, IKON=s
post-acquisition conduct does not provide more than a scintilla of evidence
IKON did not intend to perform under the Agreements at the time it entered into
them.  The conduct Eifert cites is not
material to the specific promises created by the job description, i.e.,
Eifert=s
initial authority over establishment and management of the MAC  and the ASC. 
Although the cited conduct may have been relevant to Eifert=s
ability to achieve extra contractual goals, those goals are not material to a
fraud claim based on the job description.

To
the contrary, shortly after the acquisition, Shirley Gassen, an IKON vice
president directly under McClusky in the central region and coordinator of all
the ASCs, came to Houston to talk with Eifert=s personnel about the ASC. 
In addition, the evidence established Eifert delegated most of the
responsibility for the MAC and the ASC to Global employees of Eifert=s
own choosing.  Immediately after the
acquisition, Baty was placed in charge of the MAC.  According to Baty, AAfter
the MAC, we basically dovetailed into the ASC.@  Eifert appointed or
approved Williams as head of the ASC and Baty as controller of the ASC.  Within approximately one year of the
acquisition, the MAC had been integrated into the ASC, and the scope of the ASC=s
responsibility had expanded to include Louisiana.

Even
viewing the evidence in the light most favorable to the verdict, we conclude
there is no evidence that IKON, at the time it entered into the
Agreements,  did not intend to perform
the specific promises set forth in Eifert=s job description.

c.  Global to be a stand-alone company for two
years with Eifert as president.  A promise to do an act in the future is
actionable fraud when made with no intention of performing the act.  Spoljaric, 708 S.W.2d at 434.  For Eifert to prevail on the stand-alone
theory, he had to present some evidence that, at the time IKON promised Global
would be a stand-alone company with Eifert as president for two-years, IKON had
no intention of performing.  See
Formosa Plastics, 960 S.W.2d at 47B48;  T.O. Stanley Boot,
847 S.W.2d at 222.








Eifert
points to the following evidence of pre-acquisition conduct as supporting fraud
based on his stand-alone theory: (1) IKON=s not following up on a promise to provide a written job
description until after Eifert sent a letter effectively terminating the
negotiations; (2) two meetings in which Hollis is told he will be president of
Texas; (3) IKON=s commencing to consolidate the other Houston dealerships
before acquiring Global; (4) Hollis=s arranging, in a sublease agreement, an option for expansion
space for the Canon sales force, which would come from Global.[15]
There is no Alogical bridge@ between these occurrences and the conclusion IKON, at the time
it signed the agreement, did not intend Global to stand alone for two
years.  See Lozano, 52 S.W.3d at
152.  Absent this connection,
pre-acquisition conduct is irrelevant to whether IKON had no intention of
performing the promises in the Agreements when made.

In
addition, Eifert points to the following post-acquisition conduct: (1) McClusky=s
Ahint[ing]@
and Aallud[ing]@
in the first few months after acquisition that various pieces of Global be
assigned to Hollis and McClusky=s specific statement at the November, 1996 meeting; (2) other
actions taken at the November, 1996 meeting that transferred portions of Global
to other entities, and (3) McClusky=s statement in November, 1996 that Eifert had to acquiesce in
the changes.    This conduct relates to
changes made after November 13, 1996C changes that occurred after Eifert himself proposed
consolidation of the Houston marketplaces.








In
at least two documents, written during the period of late September and early
October 1996, Eifert proposed combining IKON and Global into a single
marketplace.  At the time, however,
McClusky was specifically telling the central region presidents he did not want
to combine sales and budgets of what were then separate entities.  As late as December 5, 1996, Dinkelacker
expressed his commitment that Global was to remain intact until September,
1998.  Granted, the changes which
occurred after Eifert proposed consolidation were not entirely the changes
Eifert envisioned.  These changes,
however, coming when and how they did, constitute no evidence that IKON, when
it signed the acquisition agreement, lacked the intention of maintaining Global
as a stand-alone company with Eifert as president for two years.

Considering
all the evidence in the light most favorable to the jury=s
verdict, indulging every reasonable inference in favor of Eifert, we conclude
there is no evidence that IKON, at the time it entered into the Agreements, did
not intend that Global would be a stand-alone company for two years with Eifert
as president.

CONCLUSION

We
hold the evidence is legally insufficient to support the jury=s
finding IKON committed common law fraud against Eifert.  Accordingly, we sustain IKON=s
issue one, reverse the judgment of the trial court, and render judgment Eifert
take nothing on his cause of action for common law fraud.  Because of our disposition of issue one, we
need not address IKON=s issues two through six.

 

 

 

/s/        John
S. Anderson

Justice

 

 

 

 

Judgment rendered and Opinion filed July
31, 2003.

Panel consists of Justices Yates,
Anderson, and Fowler.











[1]  At the time of
the acquisition, IKON was known as Alco Office Products.  As do the parties, we refer to the company as
IKON.





[2]  The Plan and
Agreement of Reorganization provided IKON was to deliver common stock valued at
$35,838,799 Aas determined based upon the average closing price of
the [IKON] Stock, as recorded on the New York Stock Exchange Composite Tape,
for the thirty business days prior to the three business days prior to, but not
including, the Closing.@  The aggregate
value of the stock was actually more than 
$35,838,799 on May 31, 1996.





[3]  At
trial, Dinkelacker confirmed that Afor
the time being@ was consistent
with Eifert=s ability to
earn the position of full responsibility, including revenue producing
functions.  Dinkelacker also testified he
Ahad no
intention beyond [the two year period set forth in the Employment Agreement] as
to where Eifert=s . . . career
path would go.@  In deposition, Dinkelacker testified he
specifically informed Eifert he would never have a career with revenue
responsibility.





[4]  Under Brady=s proposed description, Eifert=s responsibility for P&L for Global would run
through September 30, 1998, Aunless otherwise determined by mutual agreement@ between Eifert and the IKON Central Regional
President.  No end date was given for the
IKON administrative and non-revenue responsibilites.  In the final description, all
responsibilities ran through May 31, 1998, unless otherwise determined by
mutual agreement.





[5]  Eifert
did delegate much of the responsibility for the MAC and the ASC to his former
Global employees and assistants.  He
delegated establishment of the ASC to Jimm Williams, and the majority of his
MAC responsibility to Baty, although the MAC still reported to Eifert.  Either Eifert or Williams appointed Baty to
work on the ASC, as well.  With Eifert=s
recommendation, IKON ultimately selected Williams as vice-president of the ASC,
but Williams then reported solely to the central region president.  Green was heavily involved with planning the
facilities for the ASC, but was not involved with the actual operation.

 

During the development of the ASC, Baty was communicating with
Eifert all the time.  Williams saw Eifert
every day and reported to him in his ASC role. 
According to Williams, Eifert attended some or a few of the ASC project
team meetings.  Williams and Rob Sissell,
an outside consultant, gave and distributed regular reports regarding the
establishment of the ASC.  From the time
Williams was named head of the ASC through May 1997, when the ASC opened, Eifert
received reports and was provided information when he asked for it.





[6]  A Amerger clause@ is A[a] provision in a contract to the effect that the
written terms may not be varied by prior or oral agreements because all such
agreements have been merged into the written document.@  Black=s Law Dictionary 989 (6th ed.
1990).





[7]  Eifert does
not contend the Agreements were not freely negotiated.





[8]   
Specifically, the Armstrong plaintiffs alleged that AHS fraudulently
told them that it was expanding its Systems Checks program and that the average
contract cost in Texas was based on Ahistorical
and current cost data.@  Their
employment agreements provided that A>AHS
shall have the sole right to determine whether to implement a systems check
program and to what extent.=@  The agreements
also provided that A>AHS makes no representations, warranties, and/or
guarantees of the accuracy of the numbers and/or assumptions, the savings to be
realized and/or bonus to be paid under Cost Savings Programs 1-6,= and that all numerical information and assumptions
were >estimated= and >provided for information purposes only.=@  Armstrong
v. Am. Home Shield Corp., No. 02-10596, 2003 WL
21297251, at *4B5 (5th Cir.
June 6, 2003).





[9]  Eifert directs
this court=s attention to John v. Marshall Health Services,
91 S.W.3d 446 (Tex. App.CTexarkana 2002, pet. denied).  In John, the Texarkana court
distinguished the disclaimer in the case before the court from that in Schlumberger,
observing, A[T]he disclaimer in this contract is not specific to
the representations made to Dr. John. 
The disclaimer is more like >boilerplate= contract language rather than something negotiated by
the parties.@  Id. at
450.  The court, however, also
distinguished Schlumberger because the parties, at the point of
contracting, were not disputing the information on which John relied and
because John was not represented by counsel. 
Id.  We conclude the
present case is more analogous to Schlumberger than to John, and
John is not binding precedent for this court.





[10]  Eifert groups
these representations in different ways at various points in his appellate
brief.  We  believe the preceding grouping is used most
frequently in his argument.  





[11]  This is the
characterization of the promise as set forth in Eifert=s appellate brief. 
In his live pleadings, Eifert characterized the promise as one that
Eifert would have a Ameaningful@
position as CEO of Texas and he Awould
have authority over and be reported to by other presidents in Texas.@  A statement,
if made, that the position would be meaningful is too vague to provide a
standard by which the jury could measure the accuracy of the representation,
and therefore is nonactionable.  See
Bradford v. Vento, 48 S.W.3d 749, 759 (Tex. 2001) (holding shopping mall
manager=s statement he would Atake care
of@ buyer=s concerns in a few months too vague to be
actionable); Wilde v. First Fed. Sav. & Loan Ass=n of Wilmette,
480 N.E.2d 1236, 1242B43 (Ill. App. 1985) (holding alleged guaranty of
employment in Ameaningful role@ after
merger nonactionable as concerning future or contingent events, expectations,
or probabilities, rather than present or existing facts).





[12]  Eifert also
points to McClusky=s testimony the term ACEO
Texas@ did not make sense to him.  McClusky prefaced that testimony by saying
Dudek had mentioned the term before McClusky=s trip
to Houston to meet with Eifert, but McClusky did not know what it meant until
he (McClusky) talked with Eifert. 
Finally, Eifert  represents
McClusky as testifying he would never have offered Eifert the position of CEO
of Texas because it would have subsumed one-third of McClusky=s own job.  In
the cited testimony, however, McClusky is 
referring to Eifert=s desire to be CEO of Texas for both revenue
and non-revenue, not the position as set forth in the job description.





[13]  Although there
was testimony CFOs were not told to report to Eifert, there is no
evidence CFOs were told not to report.  Only market place presidents were told they
would not report to Eifert, and that representation would be consistent with
the provision that the position of CEO of Texas was limited to administrative
and non-revenue responsibilities.





[14]  These
statements are understandable, given that the ASC was to cover Texas, while the
MAC was confined to the Houston market area.





[15]  It appears
from Hollis=s testimony that the sublease was negotiated while
Hollis was in the process of merging the eight dealerships IKON had already
acquired.  Hollis testified the expansion
space on the 31st floor Awas not signed for right up front.  It was an option to expand.@  The sublease
had a conditional expiration date of March 29, 2004.  The right to expand to the 31st floor
extended for the entire sublease period.