Christopher Leigh JOHN, Appellant,

v.

MARSHALL HEALTH SERVICES, INC., and Harrison County Hospital Association, Inc., d/b/a Marshall Regional Medical Center, Appellees.

No. 06–99–00169–CV.

Court of Appeals of Texas, Texarkana.

Submitted Oct. 15, 2002.

Decided Nov. 8, 2002.

Rehearing Overruled Dec. 10, 2002.

Kenneth L. Ross, Ross, Hudgens & Graves, Longview, David J. Schenck, Hughes & Luce, LLP, Dallas, for appellant.

Deborah J. Race, Ireland, Carroll, Kelley, PC, Tyler, for appellee.

Before MORRISS, GRANT, and WILLIAM J. CORNELIUS,\* JJ.

## OPINION

Opinion by Justice WILLIAM J. CORNELIUS (assigned).

Dr. Christopher Leigh John sued Marshall Health Services, Inc., and Harrison County Hospital Association, d/b/a Marshall Regional Health Center (collectively the hospital) for damages, alleging that the hospital fraudulently induced him to enter into a physician's recruitment contract to move his medical practice from Brownwood, Texas, to Marshall, Texas. The case went to trial before a jury. After the close of the evidence, the trial court submitted the case to the jury. After considerable deliberations, the jury announced that it was hopelessly deadlocked. At that point, the trial court stated it was going to declare a mistrial, but then it directed a verdict against Dr. John. Dr. John now appeals. Because we find that Dr. John presented some evidence supporting his claim of fraudulent inducement, we reverse and remand the case for trial.

Dr. John is a physician specializing in internal medicine. Before moving his practice to Marshall, he practiced medicine in Brownwood. In Brownwood, Dr. John began to buy or lease various pieces of specialized equipment, including an electrocardiogram machine, a heart monitor, a pulmonary function laboratory, a cardiopulmonary exercise laboratory, a bone densitometry instrument, and an echocardiogram. Because of this expensive equipment, Dr. John needed a large number of patients needing the use of that type of testing equipment in order to have a successful practice. His practice fared well in Brownwood, but eventually he became worried about the number of physicians coming to the Brownwood area, so he expressed his concern to a physicians' recruiter. The recruiter passed Dr. John's resume along to the Marshall hospital's recruiter, Diana Taylor. Taylor then began to recruit Dr. John to move to Marshall. During the recruitment process, Taylor and Dr. John had between ten and twenty telephone conversations. Dr. John also met jointly with Taylor and Robert Driewer, the hospital's CEO. Dr. John testified that he had three major concerns related to relocating his practice: whether there was a sufficient number of potential patients in the area to sustain a busy medical practice, whether he would be able to use his specialized skills and equipment, and whether there would be call coverage available to him. Taylor sent Dr. John a packet of information about Marshall and the hospital. Included in the packet was a profile of the hospital

\* William J. Cornelius, Chief Justice, Retired, Sitting by Assignment.

which contained, among other things, the following information:

Marshall Memorial Hospital is the only hospital in the county and has a service population of 25,000 in Marshall and has a total of 75,000 for the county. The primary service area of Marshall evidenced a draw rate of 85.2% per 1,000 population. The majority of the Hospital's total admissions (75%) come from Marshall.

Later, in the process of conducting discovery for his lawsuit, Dr. John learned that the hospital had commissioned a "Community Health Care Assessment" study. This study was released to the hospital approximately eight months before the recruitment of Dr. John, and among other things, it revealed that "[o]nly 27.4% of the people surveyed [within the hospital service area] said they would seek medical help in Marshall as opposed to neighboring towns." The hospital had also completed a telephone survey approximately five months before the recruitment of Dr. John. This survey concluded that only seventeen percent of the service population received health care in Marshall. None of the information in these surveys was revealed to Dr. John in the recruiting process.

Dr. John testified that, during his recruitment, Taylor repeatedly assured him Marshall was desperate for medical care and that his skills and equipment would be needed in the area, and that call coverage would not be a problem. Taylor testified she did not remember the substance of the conversations between her and Dr. John. After these discussions with Taylor and a visit to Marshall, Dr. John and the hospital entered into a Physician Recruitment Agreement. This contract contains a disclaimer which reads:

This Agreement, any amendments or addenda hereto, and any exhibits specifically mentioned therein constitute the entire agreement between the parties regarding the subject matter hereof and supersede all prior contemporaneous discussions, representations, correspondence and agreements, or whether oral or written, pertaining thereto. This Agreement may be amended or modified only by a writing duly executed by both parties. The language of this Agreement shall be construed as a whole according to tis [sic] fair and common meaning and shall not be construed for or against either of the parties hereto.

As a result of the contract, Dr. John moved his Brownwood practice to Marshall. He testified that his Marshall practice was not as profitable as his Brownwood practice. He saw fewer patients in Marshall than in Brownwood, and his equipment was not used nearly as much as he had believed it would be used. Dr. John testified that call coverage for his practice in Marshall was a "disaster from the very beginning."

Dr. John contends the trial court erred in entering a directed verdict for at least one of three reasons: (1) the directed verdict was based on the trial court's erroneous reliance on the case of *Schlumberger Technology Corp. v. Swanson*, 959 S.W.2d 171 (Tex.1997); (2) the directed verdict was not proper because there was some evidence raising a fact issue on Dr. John's claims of fraudulent inducement; and (3) the directed verdict was erroneously entered in absence of a motion at the close of evidence and after the jury had been discharged and a mistrial declared.

The trial court based its decision, at least in part, on the holding of the *Schlumberger* case. After the jury had deadlocked and the trial court announced its intention to declare a mistrial, the court said, "My inclination in this case based on the evidence is that with regard to Mar-

shall Health Services that construing *Schlumberger* and the *Starlight* [case][1] that I should grant a directed verdict in favor of Marshall Health Services and I will grant judgment based on that for them." In *Schlumberger*, the Texas Supreme Court held that a release that clearly expresses the parties' intent to waive fraudulent inducement claims, or one that explicitly disclaims reliance on representations about specific matters then in dispute, can preclude a claim of fraudulent inducement. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d at 181. However, in that case, the court emphasized that a disclaimer of reliance or a merger clause will not always bar a fraudulent inducement claim. *Id.* The court was careful to point out that its holding was specifically based on the facts "on this record." *Id.* Because the holding in *Schlumberger* was fact specific, it is necessary to compare the facts of this case to those in the *Schlumberger* case to determine whether that case governs the situation here.

The facts in *Schlumberger* revolved around a joint venture between Schlumberger and the Swanson family to mine diamonds from the ocean floor of the South African coast. *Id.* at 173. The contract involved in that case was an effort to end the relationship between the parties because they were in a current dispute about the project's value and feasibility. *Id.* at 174. Ultimately, the parties agreed that Schlumberger would buy out the Swansons, and in exchange the Swansons relinquished all rights, claims, and interests in the offshore diamond project and specifically released all causes of action, known or unknown, against Schlumberger.

*Id.* Later, the Swanson family alleged that Schlumberger misrepresented the project's value to them, and they sued for fraudulent inducement with respect to the release they had signed. *Id.* In *Schlumberger*, the court found the following facts to be significant: (1) the parties were attempting to end their relationship, (2) the parties had become "embroiled in a dispute," (3) they were dealing at arm's length, (4) both parties were represented by highly competent and able legal counsel during the negotiations for the terms of the release itself, (5) both parties were knowledgeable and sophisticated business players, and (6) the terms of the release "in clear language . . . unequivocally disclaimed reliance" on the specific representations of the value of the project that were the basis for the Swansons' lawsuit. *Id.* at 179–80.

After the *Schlumberger* decision, a number of Texas courts addressed fraudulent inducement claims and concluded that such claims survive merger clauses and disclaimers of representation unless those disclaimers are of the character as those in the *Schlumberger* case. *See Woodlands Land Dev. Co. v. Jenkins*, 48 S.W.3d 415 (Tex.App.-Beaumont 2001, no pet.); *Burleson State Bank v. Plunkett*, 27 S.W.3d 605 (Tex.App.-Waco 2000, pet. denied); *Fletcher v. Edwards*, 26 S.W.3d 66 (Tex.App.-Waco 2000, pet. denied). The contract and the circumstances surrounding its formation determine whether a disclaimer of reliance is binding. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d at 179. Like other post-*Schlumberger* cases, the circumstances surrounding the formation

---

1. This is an unpublished opinion by the Austin Court of Appeals. The actual opinion given to the trial court was a previously issued opinion, *Starlight v. Xarin Austin I, Ltd.*, No. 03–97–00747–CV, 1998 Tex.App. LEXIS 6041, 1998 WL 655517 (Tex.App.-Austin Sept. 24, 1998), which was later withdrawn. The unpublished substituted opinion is found at *Starlight v. Xarin Austin I, Ltd.*, No. 03–97–00747–CV, 1999 Tex.App. LEXIS 159, 1999 WL 11213 (Tex.App.-Austin Jan. 14, 1999).

of the contract in this case are quite different from the circumstances surrounding the formation of the contract in *Schlumberger.*

Here, the contract was the beginning, not the end, of the relationship between Dr. John and the hospital. The parties were not disputing the information provided to Dr. John. In fact, Dr. John was relying on the information given by the hospital about the percentage of the local population that was serviced by the hospital and the availability of call coverage, because he did not have access to such information. Moreover, the disclaimer in this contract is not specific to the representations made to Dr. John. The disclaimer is more like "boilerplate" contract language rather than something negotiated by the parties. Additionally, the record does not indicate that Dr. John was represented by legal counsel during the contract negotiations. Considering the factual distinctions between this case and the *Schlumberger* case, we conclude that the trial court erred in directing a verdict against Dr. John based on the disclaimer clause found in the physician's recruitment contract.

■ We also conclude that the trial court erroneously directed a verdict because Dr. John presented some evidence in support of the elements of his claim for fraudulent inducement.

We review a trial court's directed verdict de novo. *Knorpp v. Hale,* 981 S.W.2d 469, 471 (Tex.App.-Texarkana 1998, no pet.); *Graham v. Atl. Richfield Co.,* 848 S.W.2d 747, 750 (Tex.App.-Corpus Christi 1993, writ denied). When reviewing a directed verdict, we consider the evidence in the light most favorable to the party against whom the verdict was directed, disregarding all contrary evidence and inferences, and giving the losing party the benefit of all reasonable inferences raised by the evidence. *Qantel Bus. Sys., Inc. v. Custom Controls Co.,* 761 S.W.2d 302, 303 (Tex.1988). If there is any evidence of probative force to raise a fact issue on a material question, the issue must go to the jury, and a directed verdict is improper. *Najera v. Great. Atl. & Pac. Tea Co.,* 146 Tex. 367, 207 S.W.2d 365, 367 (1948); *Cavazos v. Fidelity & Cas. Co. of N.Y.,* 590 S.W.2d 173, 175 (Tex.App.-Corpus Christi 1979, no writ).

■ To establish fraudulent misrepresentation, a party must establish "a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, and which caused injury." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex.1998). In this case, Dr. John offered testimony about his conversations with Taylor during his recruitment process. He testified he was given positive assurance about each of his concerns. He also testified that he received and relied on the hospital profile that was sent to him by the hospital. He testified that all of this was material to his decision to relocate his practice to Marshall, and he relied on it in deciding to enter into the recruitment contract. Dr. John testified that, after relocating to Marshall, he discovered that the assurances by Taylor were false. His net income was significantly reduced. He saw fewer patients. He did not use his equipment as expected. And, he found the available call coverage was disastrous. Viewed in the light most favorable to Dr. John, there is some evidence, which if believed by the jury, is sufficient to establish a claim for fraudulent inducement. These kinds of issues belong to the jury, and a directed verdict was improper in this case.

The hospital contends there is considerable evidence contradicting Dr. John's evi-

dence and casting doubt on his reliance on any representation by Taylor or the hospital in deciding to move his practice to Marshall. But in reviewing the propriety of the directed verdict, we are required to disregard all contradicting evidence and consider only the evidence and inferences supporting Dr. John's contentions. *Qantel Bus. Sys., Inc. v. Custom Controls Co.,* 761 S.W.2d at 303.

Dr. John also contends that a directed verdict was improper for two procedural reasons: (1) the motion for directed verdict was not renewed at the close of all of the evidence, and (2) the directed verdict was granted after the trial court orally declared a mistrial. As we have found that a directed verdict was improper because fact issues existed, it is unnecessary that we consider these issues.

For the reasons stated, we reverse the judgment and remand this cause to the trial court for trial.

Justice ROSS not participating.