**IKON OFFICE SOLUTIONS, INC., Appellant,**

v.

**Steven EIFERT, Appellee.**

**No. 14–01–01104–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

July 31, 2003.

Rehearing En Banc Overruled Feb. 5, 2004.

Frank G. Jones, John Wesley Raley and William J. Boyce, Houston, for appellants.

Eugene B. Wilshire, Jr., and Patrick J. Dyer, Houston, for appellees.

Panel consists of Justices YATES, ANDERSON, and FOWLER.

## OPINION

JOHN S. ANDERSON, Justice.

A jury found in favor of appellee Steven Eifert on his common law fraud claim against appellant IKON Office Solutions, Inc. The jury awarded $2 million dollars in actual damages and $2 million dollars in punitive damages, and the trial court rendered judgment on the verdict. On appeal, IKON presents six issues challenging the legal and factual sufficiency of the evidence supporting the affirmative findings of fraud, actual damages and punitive damages, and the negative findings on IKON's defenses of waiver and ratification. Concluding there is no evidence to support Eifert's fraud claim, we reverse and render judgment Eifert take nothing.

## FACTUAL BACKGROUND

This case arises out of IKON's 1996 acquisition of Global Services, Inc., a Houston based office products dealership, with sales and leasing interests in the Texas Gulf Coast area.[1] IKON is a nationwide office products distributor. In terms of distributors (as opposed to integrated manufacturers like Xerox), Global was IKON's largest Houston competitor in 1995. Eifert owned virtually all of Global's common stock.

The acquisition was structured as a sale/merger in which IKON acquired Ei-

---

1. At the time of the acquisition, IKON was known as Alco Office Products. As do the parties, we refer to the company as IKON.

fert's stock in Global in exchange for payment to Eifert of an amount of IKON's publicly traded stock valued at $35,838,799 and other consideration.[2] The transaction was accomplished by means of two contracts: (1) a "Plan and Agreement of Reorganization" (the "Acquisition Agreement") governing IKON's acquisition of Global's stock and (2) an "Employment and Non–Competition Agreement" (the "Employment Agreement") governing Eifert's role with IKON after the acquisition.

The negotiations leading up to the acquisition spanned several months. In late 1995, IKON designed an acquisition strategy called "Operation Preemptive Strike," intended to preempt acquisition of copier dealers by competitors. At the time, IKON was in transformation from being a roll-up company, which acquired dealerships and let them continue operations as essentially independent units competing against each other, to being an integrated operating company under one market president. Under "Operation Preemptive Strike," IKON gave a target company "a window of opportunity" to join the IKON organization. As explained by IKON president Kurt Dinkelacker, IKON was going to start looking more like an integrated operating company, and "it would be very difficult to bring additional copier dealerships into the fold once we had decided who was going to run a given marketplace."

In October 1995, Dinkelacker called Eifert to ask whether Eifert would be interested in selling Global. According to Eifert, Dinkelacker said Eifert's decision would determine how the Houston marketplace would be run. Dinkelacker did not tell Eifert IKON was transforming its operating structure. Dinkelacker came to Houston to meet with Eifert. At that meeting Eifert told Dinkelacker he wanted a challenging career for himself and his employees, and Dinkelacker assured Eifert his requirements would be accommodated. At trial, Dinkelacker also stated he made a commitment to Eifert that Global would be a stand-alone company for two years. The 1995 meeting concluded with Dinkelacker telling Eifert to expect a call from Mike Dudek, IKON's vice-president of acquisitions. In November, 1995, Eifert wrote Dudek to inform Dudek that Global's attorney, William York, would be handling both the estate tax planning and the documentation of the transaction if it proceeded.

Dudek met with Eifert in Houston in early January 1996. According to Eifert, Dudek offered Eifert the presidency of IKON's Houston marketplace in the copier division, a position that involved "heading up" Global and the eight or nine Houston-area IKON copier dealers that were then reporting to Charlie Hollis as president. Eifert agreed to a price of $42 million, a price he found acceptable if they could "get some other matters arranged."

On January 24, 1996, IKON sent Eifert a letter of intent incorporating the $42 million purchase price, and Eifert signed and returned the letter. Dudek then called to say Galen McClusky, president of IKON's central region and the man who would be Eifert's boss after the sale, would stop by Houston to visit with Eifert.

Around the same time, Dudek, McClusky, and Hollis were in Hawaii attending a meeting of IKON executives.

**2.** The Plan and Agreement of Reorganization provided IKON was to deliver common stock valued at $35,838,799 "as determined based upon the average closing price of the [IKON] Stock, as recorded on the New York Stock Exchange Composite Tape, for the thirty business days prior to the three business days prior to, but not including, the Closing." The aggregate value of the stock was actually more than $35,838,799 on May 31, 1996.

While on a sailboat, Dinkelacker told Hollis and McClusky to go "below decks" to discuss the potential acquisition of Global. Hollis asked how the acquisition would affect his existing position as president of IKON Office Products for Houston. According to Hollis, Dinkelacker said, "[D]on't worry about it, you are going to run Houston for us and everything [sic] is going to end up working for you." Hollis assumed Eifert was just going to take his acquisition money and leave. Eifert was not told about the offer to Hollis.

Shortly after the meeting in Hawaii, McClusky met with Eifert in Houston. According to Dinkelacker, McClusky had to insure that Eifert's "job description would fit into the overall organizational structure of the central region." McClusky had to "put together the original operational view of what Mr. Eifert should be doing." Eifert testified he reiterated to McClusky the non-negotiable aspects of the job description.

A few days later, Dudek called Eifert and told him to go to Kansas City to negotiate Eifert's job with McClusky. According to Eifert, the Kansas City meeting culminated in Eifert's being offered the position of CEO of Texas. Eifert testified McClusky agreed that being CEO meant Eifert (1) would be "boss of all the [IKON] Office Products in the state," (2) would report directly to McClusky and have authority over the district dealerships, and (3) would retain his job description as president of Global Services. McClusky called Dinkelacker on a speaker phone to advise him of the agreement. At trial, Dinkelacker confirmed he had received the call from McClusky, and recalled that an agreement had been reached. Dinkelacker was "pretty sure" they did not tell him the specifics of the agreement.

A few days after Eifert returned to Houston, Dudek called again. According to Eifert, Dudek said Eifert could not be full CEO of Houston because IKON was in mid-fiscal year and a change in revenue reporting structure would affect their bonus programs. Eifert therefore could not have immediate responsibility for sales and service, but he would have responsibility for all administrative, non-revenue functions. Eifert would remain president of Global with both revenue and non-revenue authority. Eifert accepted. He stressed this was just for the "time being," and stated he did not mind "having to earn [his] stripes." After later learning how other's presidents' budgets and bonuses and his own compensation package were set up, Eifert determined placing him in charge of revenue in mid-fiscal year would have had no effect on IKON's bonus programs.

On February 15, 1996, Eifert wrote McClusky to summarize their discussions and agreements. Eifert stated he would carry dual titles: president of Global and CEO of Texas. As Global's president, Eifert would be responsible for all aspects of Global. As CEO of Texas, Eifert's "initial function" would be to take executive and administrative responsibility for all non-revenue producing areas. He confirmed that his career path objective was the eventual combining of revenue producing areas with responsibility for administrative (non-revenue producing) operations under the single position of CEO of Texas. He sought eventually to abandon the "staff support" position on an organizational chart for a direct report position between McClusky and the various dealership principals. Eifert emphasized that mutual understanding of his career path objective was of vital importance to him. Eifert closed by requesting, "Please let me know if any one of the responsibilities, goals or conditions outlined here are not in keeping with your recollection of our agreement."

Neither McClusky nor Dudek responded to the letter. Larry Kludt, IKON's human resources director, talked to Eifert about the letter twice, and, according to Eifert, "there was no discrepancy either time." Kludt met with Eifert, made notes on a copy of the letter, underlined the sentence referring to a single position of CEO of Texas, and wrote, "Original offer prior to Dudek phone call." Another note on the same page indicates, "Marketplace Presidents report to Galen [McClusky] for revenue and to Steve [Eifert] for non-revenue."

On February 27, 1996, Eifert and his assistant, Bill Green, participated in a telephone conference regarding the letter. According to Green's notes of the conference, McClusky stated, "I don't really have a problem with the letter as Steve and I discussed this before he wrote it. There are issues here but mostly they deal with timing." At trial McClusky testified his comment referred to operational issues. Green also reported McClusky as saying, "I agree to everything in the letter but a timeline is needed." McClusky testified he was not saying anything about CEO for Texas. According to Green's notes, Dinkelacker twice referred to the necessity for Global to have credible earnings. Dudek concluded the conference by stating he would execute the employment contract based on what had been discussed and send it to Eifert for review. When Eifert did not hear anything for six weeks, he sent a letter on April 16, 1996, effectively terminating the process.

Within a few days, IKON contacted Eifert, and on April 25, 1996, the parties held another conference call. IKON promised to send the following day the job description it had promised in February, and Kludt subsequently forwarded a draft posi-

tion guide. Kludt described Eifert's duties as President of Global through September 1997 and concurrently "CEO Texas" with responsibility "for the administrative functions and non-revenue producing operational and logistical functions of all IKON dealers' operations in Texas." Kludt invited Eifert to make any modifications as Eifert saw fit.

Larry Baty, a certified public accountant and a Global consultant, responded by letter, mentioning, among other things, that the time period (which was less than the two years previously discussed) would not allow Eifert "to keep his commitment to his employees to work their way into the IKON system." In the same paragraph, Baty stated Eifert "would like to have the same authority, accountability and responsibility given to other CEO's [sic] of IKON States."

On May 7, 1996, the parties again held a conference call, reviewing Baty's letter, paragraph by paragraph. Notes of the conversation indicate discussion of the time period, but not the responsibility attached to the CEO position.

On May 10, 1996, Bill Brady, IKON's attorney, submitted a revised job description to Eifert. In the accompanying letter, Brady represented he had "reviewed all of the materials [Eifert] sent, as well as my notes of the various conversations. I also confirmed with Galen [McClusky] his commitment to you. It is my belief that we are now all working from the same page." In the section relating to specific commitments, Brady had included a phrase indicating revenue producing functions would remain with other Texas operating companies, "for the time being." [3] With the ex-

---

**3.** At trial, Dinkelacker confirmed that "for the time being" was consistent with Eifert's ability to earn the position of full responsibility, including revenue producing functions. Dinkelacker also testified he "had no intention beyond [the two year period set forth in

ception of a change in the time period through which Eifert's responsibilities were to run, Eifert's responsibilities were the same as those ultimately incorporated into the Employment Agreement.[4] Brady asked Eifert to review the job description and "provide any revisions which you feel better clarify your position with IKON." Following this correspondence, Eifert and IKON negotiated additional financial aspects of the sale, resulting in the adjusted purchase price of $35,838,799 of IKON stock.

During the period IKON was negotiating with Eifert, it was presenting a somewhat different picture of Eifert's proposed position to IKON marketplace presidents. In addition to the discussion in Hawaii, Hollis testified about another meeting in Minneapolis, attended by three other IKON presidents from Texas and Louisiana. At that meeting, Hollis specifically asked whether they would report to Eifert, and McClusky responded, "Don't worry about it, you're going to continue to report to me." According to Hollis, it was clear the marketplace presidents were not going to report to Eifert at all. McClusky explained to Hollis that, to get the acquisition for IKON of one of the last and biggest Canon dealerships, Eifert had to have a significantly more important sounding title than all the rest of the presidents in Texas and Louisiana.

The acquisition closed on May 31, 1996, with the execution of the Acquisition Agreement and the Employment Agreement. In addition to the IKON stock, the

consideration included $1 million cash for a non-competition agreement, $2 million in bonuses for Global employees, retirement of debt, and transfer to Eifert of some real property owned by Global.

The Acquisition Agreement contains, among other provisions, a statement that it "constitutes the entire agreement concerning the subject matter hereof. No modification or waiver hereof shall be binding upon any party unless in writing and signed by or on behalf of the party against which the modification or waiver is asserted." The Employment Agreement is referenced in, and attached to, the Acquisition Agreement.

The Employment Agreement provides in part that IKON shall employ Eifert "as President of Global and Chief Executive Officer ("CEO") of the IKON Division's Texas operations, with duties as set forth on [the attached job description], for a period ... continuing until May 31, 1998 unless sooner terminated as hereinafter provided." The job description also reflects that Eifert was given the dual job title of CEO of Texas and President of Global Services. Under the job description, Eifert was to be "[r]esponsible for the P & L for Global Services through 5/31/98 unless otherwise determined by mutual agreement between the IKON Central Region President and Steve Eifert." He was also to be "[r]esponsible for the administrative functions and non-revenue producing operational and logistical functions of all IKON dealers' operations in Texas through 5/31/98 unless otherwise deter-

---

the Employment Agreement] as to where Eifert's ... career path would go." In deposition, Dinkelacker testified he specifically informed Eifert he would never have a career with revenue responsibility.

4. Under Brady's proposed description, Eifert's responsibility for P & L for Global would run through September 30, 1998, "un-

less otherwise determined by mutual agreement" between Eifert and the IKON Central Regional President. No end date was given for the IKON administrative and non-revenue responsibilities. In the final description, all responsibilities ran through May 31, 1998, unless otherwise determined by mutual agreement.

mined by mutual agreement...." Eifert was to have responsibility for establishing and managing a regional administrative service center (ASC) for Texas and a marketing administrative center (MAC) for the Houston marketing area. In addition, the job description provides:

> As both CEO of Texas and President of Global, Employee will report directly to the Central Region President of IKON. Employee shall have both executive and administrative responsibility for non-revenue producing administrative areas for the state of Texas. All revenue producing functions, including but not limited to equipment sales, service and aftermarket sales outside of Global, shall remain for the time being with the other Texas IKON operating companies.

The Employment Agreement, to which the job description was attached, contains clauses stating it contains the entire agreement between the parties; supercedes prior employee and compensation agreements; and can be changed, modified or extended only in writing. It also contains a provision stating, "[N]o commitments have been made relative to bonuses, guarantees or any other special provisions, except as specifically identified herein."

In his first week on the job, Eifert tried to discuss his job position and reporting requirements with Hollis. Hollis knew nothing about having to report to Eifert. According to Eifert, when he showed Hollis the job description, Hollis was shocked. Hollis also had not been told the MAC would be reporting to Eifert.

Eifert testified none of the other Texas presidents had been told to report to him, and when he requested budget information, his request was refused. When he asked for information from the marketplace presidents, he was rebuffed or ignored, with one marketplace president telling Eifert to "bug off." Eifert was unable to obtain information regarding inventory levels, insurance programs, advertising plans, logistical data, or warehousing. Eifert complained to McClusky and others about his inability to obtain information.[5]

By mid-September 1996, McClusky was concerned about Hollis's and Eifert's inability to work together as a team. McClusky directed a memorandum to them, stating "I *know* it is tough to bring two companies together in Houston. However, it is, more specifically, *your job* do so."

In a quarterly status report dated September 19, 1996, Eifert informed McClusky he was uncomfortable with the lack of any progress in regard to his responsibilities as CEO of Texas. McClusky

---

**5.** Eifert did delegate much of the responsibility for the MAC and the ASC to his former Global employees and assistants. He delegated establishment of the ASC to Jimm Williams, and the majority of his MAC responsibility to Baty, although the MAC still reported to Eifert. Either Eifert or Williams appointed Baty to work on the ASC, as well. With Eifert's recommendation, IKON ultimately selected Williams as vice-president of the ASC, but Williams then reported solely to the central region president. Green was heavily involved with planning the facilities for the ASC, but was not involved with the actual operation.

During the development of the ASC, Baty was communicating with Eifert all the time. Williams saw Eifert every day and reported to him in his ASC role. According to Williams, Eifert attended some or a few of the ASC project team meetings. Williams and Rob Sissell, an outside consultant, gave and distributed regular reports regarding the establishment of the ASC. From the time Williams was named head of the ASC through May 1997, when the ASC opened, Eifert received reports and was provided information when he asked for it.

responded Eifert needed first to "fix" Houston, but did not indicate how.

On September 25, 1996, McClusky distributed a memorandum to region presidents and central region staff, in which McClusky discussed what to do and not do during IKON's name change and consolidation into one marketplace. McClusky cautioned against trying to change the structure of the sales force or the persons having responsibility for the bottom line during the following twelve months. He advised, "[I]t is very important that you work on consolidation of Service and the transition of Administration to the ASC and the development of the MAC as your # 1 Priority."

On September 30, 1996, Eifert responded to McClusky, stating he had been re-examining the decision to maintain separate companies and had reached the conclusion "that the two dealerships should be formed into one entity. The timing of a combination is also critical in my opinion since IKON Corporate is planning a national advertising blitz beginning in January 1997." Eifert concluded by recommending the creation of a fourth marketplace with Hollis as President. The proposed marketplace "would consist of all dealerships not included in the three major metropolitan marketplaces of Dallas/Fort Worth, Austin/San Antonio and Houston." Eifert opined, "We keep the experience and value of the management team within the IKON family with a minimal level of disruption for [Hollis] and his senior staff. The creation of this marketplace would not require that they move out of Houston, just out of Transco Tower." There is no indication Eifert sent a copy of this memorandum to Hollis.

On October 3, 1996, Eifert sent a memorandum to Hollis, with a copy to McClusky, further delineating Eifert's proposal. Included were the following elements:

- Combine the plans for the two entities into a single marketplace plan with an executive incentive plan that supports the achievement of the marketplace goals instead of the competitive goals of the two companies.

- Eliminate the duplication of sales and service expenses in areas where there are no distinct differences in products or services. These areas would include Oce' (High Volume), Digital, Color and FM. I am proposing that one sales force be created for each of these four areas (as opposed to a sales force for each in each dealership) and that all revenue, earnings and cash flow be split 50/50 between the dealerships with all numbers to be applied to the joint marketplace plan and incentive program.

Eifert further proposed Global would house and manage the digital and color groups and IKON–Houston would manage the Oce' high volume specialists and FM efforts. Eifert closed by indicating he was sending the proposal to Hollis a few days in advance of McClusky's receiving a copy.

McClusky subsequently scheduled a meeting in Houston on November 13, 1996. When Eifert learned of the meeting, he wrote McClusky to suggest that the meeting would be an opportune time to discuss the CEO Texas position. Eifert also reminded McClusky that the agreement with IKON granted Eifert control over all of Global's operations and that, if McClusky were going to seek some kind of change regarding Eifert's control, Eifert wanted to discuss the matter first. McClusky responded by indicating there would be two parts to the meeting: (1) identifying all areas of conflict, and (2) establishing a structure to solve the problems.

Shortly before the meeting on November 13, 1996, Eifert again asked McClusky about the subject matter of the meeting. McClusky responded that IKON was going to change Global's name and reassign various of its departments to IKON executives within Hollis's organization. If Eifert did not go along with the changes, he was "going to sit in [his] building by [himself]."

When the meeting convened, McClusky stated the purpose of the meeting was to "create one company and one name in Houston and we will be here as long as it takes to accomplish this." Global's service department would be severed and given to Hollis. More than 150 of Global's former employees would be transferred out of Eifert's control. Global's color copier and digital sales groups consisting of another 25 employees would also be transferred to Hollis. Global was told to dispense with its systems integration unit. Finally, the Oce' product line was taken from Global and reassigned.

Shortly after the November meeting, Eifert complained to Dinkelacker in person about McClusky's decision and pointed out that promises were not being fulfilled. Dinkelacker did not respond immediately, but needed to speak with McClusky first.

Eifert was soon summoned to a meeting with Dinkelacker, McClusky, and Hollis in Valley Forge. McClusky announced that a position entitled EVP (executive vice president) was going to be open for competition, and Dinkelacker indicated that neither Eifert nor Hollis was likely to be considered for the position. Although the title was different, Eifert believed it was the position he had been promised the opportunity to earn. According to Hollis, when Eifert was temporarily out of the room, Dinkelacker reconfirmed to Hollis his earlier promise that Hollis would be president of the combined Houston market. The meeting culminated with Eifert and Hollis signing an agreement modifying aspects of the relationship between Global and IKON Houston. Eifert felt he would be fired if he did not sign; Hollis believed not signing would have affected his career negatively.

In March 1997, IKON underwent an organizational change that created 13 districts out of the then existing four or five regions. Eifert now reported to Steve Koinis, who was President and CEO of Texas–Louisiana. Under the new organization, Koinis's job was the same one Eifert believed he had the right to earn. As soon as Koinis took over, the ASC reported directly to Koinis. Koinis, appointed to his position by Dinkelacker, had never heard of the title CEO of Texas for non-revenue and administration. Neither Dinkelacker nor McClusky had briefed Koinis on what Eifert's position was.

In June, 1997, Dan Boylan assumed Koinis's position, and Williams was removed as vice president of the ASC. Boylan subsequently met with Eifert and showed Eifert two proposed organizational schemes. In one, Eifert would have been president of the Houston marketplace, but the position of a former Global employee would have been eliminated. In the other, the Global employee would have retained his position. Both plans eliminated the positions of four other Global employees. Eifert told Boylan he intended to resign, and three of his former Global executives were terminated shortly thereafter.

## PROCEDURAL BACKGROUND

Eifert sued IKON, Dinkelacker, and McClusky. Following a two-week trial, the case was submitted to the jury on statutory fraud, common law fraud, and securities fraud. The charge also contained questions on IKON's defenses of waiver and ratification. The jury returned

a ten-to-two verdict. The jury answered "no" on all three fraud claims against Dinkelacker and McClusky, "no" on the statutory fraud and securities fraud claims against IKON, and "yes" on the common law fraud claim against IKON. In addition, the jury found clear and convincing evidence of fraud. The jury awarded $2 million in actual damages and $2 million in punitive damages. Finally, the jury found against IKON on its defenses of waiver and ratification.

In six issues, IKON challenges the legal and factual sufficiency of the evidence supporting these findings. In issue one, IKON challenges the sufficiency of the evidence supporting the jury's answer of "yes" to the question on common law fraud; in issue two, the sufficiency of the evidence to support the award of $2 million in actual damages; in issue three, the sufficiency of the evidence to support a finding of clear and convincing evidence of fraud; in issue four, the sufficiency of the evidence to support the award of $2 million in punitive damages; in issue five, the sufficiency of the evidence to support the answer of "no" on IKON's affirmative defense of waiver; and in issue six, the sufficiency of the evidence to support the answer of "no" to IKON's affirmative defense of ratification.

We conclude the evidence was legally insufficient to support the jury's answer of "yes" to common law fraud and sustain IKON's issue one. Accordingly, we need not address the remaining issues.

## DISCUSSION

### I. Standard of Review

#### A. Legal Sufficiency

When a party challenges the legal sufficiency of the evidence supporting an adverse finding on an issue on which it does not have the burden of proof, that party must demonstrate on appeal that there is no evidence to support the adverse finding. *Price Pfister, Inc. v. Moore & Kimmey, Inc.*, 48 S.W.3d 341, 347 (Tex. App.-Houston [14th Dist.] 2001, pet. denied) (citing *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983)). To prevail on a legal sufficiency challenge to a question on which it had the burden of proof, a party must establish (1) there was no evidence to support the jury's finding, and (2) the evidence established a contrary proposition as a matter of law. *Schwartz v. Pinnacle Communications*, 944 S.W.2d 427, 431–32 (Tex.App.-Houston [14th Dist.] 1997, no writ).

We consider all the evidence in the light most favorable to the jury's verdict, indulging every reasonable inference in favor of the prevailing party. *Price Pfister*, 48 S.W.3d at 347 (citing *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285–86 (Tex.1998)). We will sustain a legal insufficiency point when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of a vital fact. *Id.* (citing *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). If the record contains any evidence of probative force to support the jury's finding, we must overrule the legal insufficiency point. *Id.* (citing *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex.1997)).

#### B. Factual Sufficiency

When reviewing a challenge to the factual sufficiency of the evidence, we must examine all of the evidence in the record, both supporting and contrary to

the judgment. *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989); *Marsh v. Marsh*, 949 S.W.2d 734, 739 (Tex. App.-Houston [14th Dist.] 1997, no writ). After considering and weighing all the evidence, we will sustain the challenge only if the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *Marsh*, 949 S.W.2d at 739.

## II.  Common Law Fraud and the Alleged Misrepresentations

### A.  Legal Principles

To recover for common law fraud, Eifert had to prove: (1) IKON made a material representation; (2) the representation was false; (3) when IKON made the representation, IKON knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) IKON made the representation with the intention that Eifert act on it; (5) Eifert acted in reliance upon the representation; and (6) Eifert suffered injury. *See Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 524 (Tex.1998). A promise to act in the future constitutes fraud only when made with the intention, design and purpose of deceiving—a promise made with no intention of performing the act. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986); *see Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47–48 (Tex.1998); *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 222 (Tex.1992). Although a party's intent to defraud is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made. *Anderson, Greenwood & Co. v. Martin*, 44 S.W.3d 200, 215 (Tex.App.-Houston [14th Dist.] 2001, pet. denied).

Because intent to deceive or defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence. *See Anderson, Greenwood*, 44 S.W.3d at 215 (citing *Spoljaric*, 708 S.W.2d at 435). Although circumstantial evidence may be used to establish any material fact, "it must transcend mere suspicion." *Lozano v. Lozano*, 52 S.W.3d 141, 149 (Tex.2001) (Phillips, C.J., concurring and dissenting). Reasoning from circumstantial evidence often involves linking apparently insignificant and unrelated events to establish a pattern. *See id.* A court, therefore, must not view each piece in isolation, but in view of all known circumstances. *See id.* Nevertheless, "[l]egally sufficient circumstantial evidence requires a logical bridge between the proffered evidence and the necessary fact." *Id.* at 152 (citing *Joske v. Irvine*, 91 Tex. 574, 44 S.W. 1059, 1064 (1898)).

Failure to perform a contract, standing alone, is no evidence of the promisor's intent not to perform when the contract was made, but a circumstance to be considered with other facts to establish intent. *Spoljaric*, 708 S.W.2d at 435; *Bank One, Texas, N.A. v. Stewart*, 967 S.W.2d 419, 444 (Tex.App.-Houston [14th Dist.] 1998, pet. denied). Partial performance can negate an intent not to keep a promise at the time it was made. *See Stewart*, 967 S.W.2d at 445 (holding there was no evidence party made representations with intent not to perform on note when party subsequently made payment for five years).

In addition, a party's specific disclaimer of reliance on extra contractual representations may, under certain circumstances, preclude a fraudulent inducement claim. *See, e.g., Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 180–81 (Tex.1997). In *Schlumberger*, the supreme

court held "that a release that clearly expresses the parties' intent to waive fraudulent inducement claims, or one that disclaims reliance on representations about specific matters in dispute, can preclude a claim of fraudulent inducement." *Id.* at 181. The *Schlumberger* court emphasized "that a disclaimer of reliance or merger clause will not always bar a fraudulent inducement claim." *Id.* In the course of reaching its decision, the court explained:

> The contract and the circumstances surrounding its formation determine whether the disclaimer of reliance is binding.... Because the parties were attempting to put an end to their deal, and had become embroiled in a dispute over the feasibility and value of the project, we conclude that the disclaimer of reliance the Swansons gave conclusively negates the element of reliance.

*Id.* at 179–80 (citations omitted).

The parties in *Schlumberger* were attempting to terminate a joint venture project after they became embroiled in a dispute about the value and feasibility of the project. *Id.* at 174. The parties finally agreed Schlumberger would buy out the Swansons; and, in exchange, the Swansons would relinquish all rights, claims, and interests in the project and would specifically release all causes of action, known or unknown, against Schlumberger. *Id.* The disclaimer read:

> "[E]ach of us [the Swansons] expressly warrants and represents and does hereby state ... and represent ... that no promise or agreement which is not herein expressed has been made to him or her in executing this release, and that **none of us is relying upon any statement or representation of any agent of the parties being released hereby.**

**Each of us is relying on his or her own judgment** and each has been represented by Hubert Johnson as legal counsel in this matter. The aforesaid legal counsel has read and explained to each of us the entire contents of this Release in Full, as well as the legal consequences of this Release...."

*Id.* at 180 (emphasis added by supreme court). The surrounding circumstances noted by the supreme court included the following: the parties (1) were attempting to end their relationship, (2) were "embroiled in a dispute," (3) were dealing at arm's length, (4) were represented by highly competent and able legal counsel during the negotiations over the terms of the release itself, (5) were knowledgeable and sophisticated business players, and (6) the terms of the release "in clear language ... unequivocally disclaimed reliance" on the specific representations of the value of the project, which representations were the basis for the Swansons' lawsuit. *Id.* at 179–80.

With these principles in mind, we turn now to the contract and the alleged misrepresentations in the present case.

## B. The Contract and the Alleged Misrepresentations in the Present Case

### 1. The Contract and the Merger Clauses

■ The Agreements in the present case contain merger clauses.[6] The Acquisition Agreement includes a statement that it "constitutes the entire agreement concerning the subject matter hereof. No modification or waiver hereof shall be binding upon any party unless in writing and signed by or on behalf of the party against which the modification or waiver is

---

6. A "merger clause" is "[a] provision in a contract to the effect that the written terms may not be varied by prior or oral agreements because all such agreements have been merged into the written document." BLACK'S LAW DICTIONARY 989 (6th ed.1990).

asserted." The Employment Agreement is referenced in, and attached to, the Acquisition Agreement. The Employment Agreement, to which Eifert's job description was attached, contains clauses stating it contains the entire agreement between the parties; supercedes prior employee and compensation agreements; and can be changed, modified or extended only in writing. It also contains a provision stating, "[N]o commitments have been made relative to bonuses, guarantees or any other special provisions, except as specifically identified herein."

Eifert's job description was the subject of lengthy and intense dispute and negotiation, with Eifert being given the opportunity to review and revise the description on at least two occasions. Eifert was assisted by an attorney and an accountant. Almost all of the *Schlumberger* factors are present: Eifert's sophistication (he had bought out four other dealerships); advice from an attorney and an accountant; a contract attempting to put an end to the dispute at issue (*i.e.,* the scope of Eifert's responsibilities); an arm's length transaction; and a lawsuit based on the very terms that were in dispute. *See Schlumberger,* 959 S.W.2d at 179–180; *see also Yzaguirre v. KCS Resources, Inc.,* 47 S.W.3d 532, 542–43 (Tex.App.-Dallas 2000) (following *Schlumberger* in case involving general merger clause), *aff'd,* 53 S.W.3d 368 (Tex.2001). *Cf. Fletcher v. Edwards,* 26 S.W.3d 66, 76–77 (Tex.App.-Waco 2000, pet. denied) (distinguishing case from *Schlumberger* because when Fletchers signed real estate contracts at issue containing "as is" clause, they were not attempting to resolve present dispute about availability of water, were not represented by counsel, and were not "sophisticated business players" as were the Swansons in *Schlumberger* ).

As noted, the Agreements between Eifert and IKON were freely negotiated by sophisticated parties and their counsel.[7] The merger clauses were not boiler-plate. A merger clause freely negotiated by similarly sophisticated parties as part of the bargain in an arm's-length transaction has a different effect than a provision in a standard form contract which cannot be negotiated and cannot serve as the basis of the parties' bargain. *See Prudential Ins. Co. v. Jefferson Assocs.,* 896 S.W.2d 156, 162 (Tex.1995) (using same criteria to establish enforceability of "as is" clause in agreement).

The only question in this case is whether the merger clauses in the agreements at issue are sufficiently broad and specific to conclusively negate the reliance element of Eifert's common law fraud claim considering the Employment Agreement's detailed provisions regarding Eifert's job position, titles, responsibilities and duties. Although the Texas Supreme Court has not addressed this question since it decided *Schlumberger,* decisions of other courts discussing *Schlumberger* are instructive. Cases discussing *Schlumberger* often involve releases executed in connection with settlement agreements or by parties ending not only a dispute but also their relationship, a context that involves policy and judicial economy concerns not present in the instant case. *See, e.g., Yzaguirre,* 47 S.W.3d at 542–43; *see also Schlumberger,* 959 S.W.2d at 178 (stating Texas law favors and encourages voluntary settlements and orderly dispute resolution). Other decisions referencing *Schlumberger* involve "as-is" clauses in residential real estate transaction documents, again a fact pattern generally dissimilar to this lawsuit. *See, e.g., The Woodlands Land Dev. Co. v. Jenkins,* 48 S.W.3d 415, 420–22 (Tex.App.-Beaumont 2001, no pet.). However, in a

---

**7.** Eifert does not contend the Agreements were not freely negotiated.

very recent decision with facts similar to this case, the United States Court of Appeals for the Fifth Circuit discussed *Schlumberger* and concluded that the merger clauses in the employment contracts before it were clear and unequivocal disclaimers of reliance, and thus summary judgment was proper for the defendant on the plaintiffs' common law fraud claim. *See Armstrong v. Am. Home Shield Corp.,* 333 F.3d 566, 571 (5th Cir.2003).

In *Armstrong,* the plaintiffs John and Dan Armstrong sued defendant American Home Shield Corp. (AHS), which sells and services home warranty contracts, and had acquired the home warranty business of the Armstrongs and also hired them. *Id.* at 567. The plaintiffs' employment agreements included several "savings programs," and AHS agreed to pay the Armstrongs a portion of the cost savings accomplished under each program. *Id.* The plaintiffs complained that they were not adequately compensated, and sued for breach of contract, negligent misrepresentation and fraud. *Id.* The Fifth Circuit affirmed the district court's grant of summary judgment in favor of AHS on all claims. *Id.* at 571–72.

With respect to the fraud claim, the Fifth Circuit discussed *Schlumberger* and the provisions in the Armstrongs' employment contracts. The merger clause in both provided that "[t]his Agreement shall constitute the entire contract between the parties and supercedes all existing agreements between them, whether oral or writ-ten, with respect to the subject matter hereof." *Id.* The court noted that the clause reflects the parties' intent to bar later disputes related to the underlying agreements, but "notably fails to mention or refer to prior representations." *Id.* (citing *U.S. Quest Ltd. v. Kimmons,* 228 F.3d 399, 403 (5th Cir.2000) (holding that merger clause in contract superseding all "prior or contemporaneous agreements, communications or understandings, whether written or unwritten" was a valid disclaimer of reliance upon alleged oral representation that the parties would enter into a second written contract)). The Fifth Circuit nonetheless concluded that the merger clause was a clear and unequivocal disclaimer of reliance because the contract had provisions addressing the very subject matter of the alleged representations on which the plaintiffs based their fraud claim. *Id.*[8]

Other Texas courts of appeals have held that merger clauses less specific than that in *Schlumberger* conclusively negated the reliance element of a fraud claim. *See Starlight, L.P./Xarin Austin I, Ltd. v. Xarin Austin I, Ltd.,* No. 03–97–00747–CV, 1999 WL 11213, at *8–9 (Tex.App.-Austin Jan. 14, 1999, no pet.) (not designated for publication) (concluding that although no-reliance provision in merger clause was not as "emphatic as the clause in *Schlumberger,*" it was "nonetheless clear and straightforward" in establishing that plaintiff relied only on representations in commercial real estate contract for purchase of building); *1900 SJ, Inc. v. Wash. Nat'l Ins.*

---

**8.** Specifically, the Armstrong plaintiffs alleged that AHS fraudulently told them that it was expanding its Systems Checks program and that the average contract cost in Texas was based on "historical and current cost data." Their employment agreements provided that " 'AHS shall have the sole right to determine whether to implement a systems check program and to what extent.' " The agreements also provided that " 'AHS makes no represen-tations, warranties, and/or guarantees of the accuracy of the numbers and/or assumptions, the savings to be realized and/or bonus to be paid under Cost Savings Programs 1–6,' and that all numerical information and assumptions were 'estimated' and 'provided for information purposes only.' " *Armstrong v. Am. Home Shield Corp.,* 333 F.3d 566, 570–71 (5th Cir.2003).

*Co.*, No. 01–97–00493–CV, 1998 WL 386407, at *5–6 (Tex.App.-Houston [1st Dist.] May 21, 1998, pet. denied) (not designated for publication) (concluding that "as-is" clause in custom-drafted purchase agreement relating to building precluded fraudulent inducement claim because, *inter alia*, parties negotiated the contract over an extended period of time, plaintiff was represented by experienced legal counsel and a broker, and transaction was conducted at arm's length).

We conclude it is appropriate to apply *Schlumberger* in the present case. Thus, to the extent Eifert relies on representations outside the Acquisition and Employment Agreements (including the job description) to establish his fraud claim, the evidence is legally insufficient to support that claim. *See Schlumberger*, 959 S.W.2d at 181 (stating disclaimer of reliance conclusively negates element of reliance).[9]

### 2. The Alleged Misrepresentations

Although in his live pleadings, Eifert set forth several purported misrepresentations, on appeal he relies only on three: (a) Eifert would have a career path beyond mere administrative duties; (b) Eifert would be CEO of Texas with responsibility for all administrative and non-revenue functions in Texas; and (c) Global would be a stand-alone company for two years, with Eifert as president of Global for that period ("the stand-alone theory").[10] We hold the evidence of each of these alleged misrepresentations to be legally insufficient to support a claim of fraud, albeit for different reasons.

■ **a. A career path beyond mere administrative duties.** In his appellate brief, Eifert states this promise in various ways: "a real executive position with a future within the IKON organization," the "right to earn revenue," and a "career path beyond mere administrative duties within IKON." Regardless of how the purported promises are phrased, Eifert relies solely on statements outside the Acquisition and the Employment Agreements to establish the existence of such promises. As a matter of law, given the merger clauses within the Agreements, Eifert cannot rely on these representations to support his claim of fraudulent inducement. *See id.; Yzaguirre*, 47 S.W.3d at 542–43.

■ **b. Eifert to be CEO of Texas with responsibility for all administrative and non-revenue functions in Texas.**[11] Eifert's job description provided he

9. Eifert directs this court's attention to *John v. Marshall Health Services*, 91 S.W.3d 446 (Tex.App.-Texarkana 2002, pet. denied). In *John*, the Texarkana court distinguished the disclaimer in the case before the court from that in *Schlumberger*, observing, "[T]he disclaimer in this contract is not specific to the representations made to Dr. John. The disclaimer is more like 'boilerplate' contract language rather than something negotiated by the parties." *Id.* at 450. The court, however, also distinguished *Schlumberger* because the parties, at the point of contracting, were *not* disputing the information on which John relied and because John was not represented by counsel. *Id.* We conclude the present case is more analogous to *Schlumberger* than to *John*, and *John* is not binding precedent for this court.

10. Eifert groups these representations in different ways at various points in his appellate brief. We believe the preceding grouping is used most frequently in his argument.

11. This is the characterization of the promise as set forth in Eifert's appellate brief. In his live pleadings, Eifert characterized the promise as one that Eifert would have a "meaningful" position as CEO of Texas and he "would have authority over and be reported to by other presidents in Texas." A statement, if made, that the position would be meaningful is too vague to provide a standard by which the jury could measure the accuracy of the representation, and therefore is nonactionable. *See Bradford v. Vento*, 48 S.W.3d 749, 759 (Tex.2001) (holding shopping mall manager's statement he would "take care of" buy-

would be "CEO Texas" and would report to the "IKON Central Region President." According to the job description, Eifert had two "specific accountabilities" related to CEO of Texas: (1) to establish and manage the ASC and (2) to establish and manage the order processing, billing and related administrative activities for the Houston marketplace (i.e., the MAC). Eifert's authority under the job description was to (1) "[d]evelop and implement the administrative support and logistics long range plan for IKON for the state of Texas" and (2) "[p]rovide one-over-one sign-off approval relative to the above organizations once established." Under "Specific Commitments" the job description provided:

> As both CEO of Texas and President of Global, Employee will report directly to the Central Region President of IKON. Employee shall have both executive and administrative responsibility for non-revenue producing administrative areas for the state of Texas. All revenue producing functions, including but not limited to equipment sales, service and aftermarket sales outside of Global, shall remain for the time being with the other Texas IKON operating companies.
>
> The establishment and management of the regional Administrative Service Center ("ASC") for the state of Texas (merely an issue of timing but to occur not later than October 1, 1997), as well as the Marketing Administrative Center ("MAC") for the Houston marketing areas will, in coordination with the Central Region President of IKON and the Transformation Processing Team, in compliance with guidelines established or to be established and policies of IKON, be part of Employee's responsibilities. The MAC for Houston shall be located at Global, with the ASC location site still undecided. However, Employee shall undertake a feasibility study as to the consolidation of all MAC functions for Texas in Houston, as well as developing the pros and cons of eventually establishing the ASC for the state of Texas in Houston.

In support of his theory that IKON, when it signed the Acquisition and Employment Agreements, did not intend to honor the commitments in the job description, Eifert sets forth the following evidence of IKON's pre-acquisition conduct: (1) IKON's not following up on a promise to provide a written job description until after Eifert sent a letter effectively terminating the negotiations; (2) pre-acquisition statements by McClusky and Dinkelacker to Texas market presidents that they would not report to Eifert, that CEO of Texas was a figurehead position, and that, to acquire Global, it was necessary to give Eifert a significantly more important sounding title than the rest of the Texas and Louisiana presidents; (3) McClusky's testimony he first heard of the position CEO Texas from Dudek although Eifert contends that is the position McClusky offered Eifert; and (4) McClusky's testimony he had no knowledge of Eifert's job before the acquisition because he (McClusky) was not part of the acquisition group.[12] In addition, Eifert offers the fol-

er's concerns in a few months too vague to be actionable); *Wilde v. First Fed. Sav. & Loan Ass'n of Wilmette,* 134 Ill.App.3d 722, 89 Ill. Dec. 493, 480 N.E.2d 1236, 1242–43 (1985) (holding alleged guaranty of employment in "meaningful role" after merger nonactionable as concerning future or contingent events, expectations, or probabilities, rather than present or existing facts).

12. Eifert also points to McClusky's testimony the term "CEO Texas" did not make sense to him. McClusky prefaced that testimony by saying Dudek had mentioned the term before McClusky's trip to Houston to meet with Ei-

lowing evidence of IKON's post-acquisition conduct: (1) certain of IKON's personnel never being instructed to report to him and never reporting to him; [13] (2) Dinkelacker's testimony he did not know what would fall outside the ASC and that Eifert would have lost all responsibility as CEO Texas if the ASC started reporting directly to the regional president; [14] (3) Eifert's testimony he was unable to obtain information he (Eifert) believed was necessary; (4) lack of any organizational chart showing the position of CEO of Texas; (5) Eifert's not having been consulted about IKON's lease of space in the Transco Tower nor about locating the ASC somewhere other than in Global Headquarters; (6) Eifert's testimony he initially had limited authority over the ASC, and it rapidly became apparent he had no authority; (7) Central Region CFO Dave Luckner's appointment, on Eifert's recommendation, of Jimm Williams as vice-president of the Houston ASC; (8) Eifert's testimony that Steve Koinis, president of the Texas–Louisiana District in 1997, was unaware of Eifert's job responsibilities within the title of CEO of Texas nonrevenue; and (9) Eifert's not being informed when IKON's CEO visited Houston in April, 1997.

The promises regarding Eifert's position with IKON as set forth in Eifert's job description (which was attached to, and referenced in, the Employment Agreement), related to the non-revenue administrative functions of establishing and managing the ASC and the MAC. As discussed above, given the merger clauses in the Acquisition and Employment Agreements, Eifert cannot rely on any purported representations outside these Agreements to support his fraudulent inducement claim. *See Schlumberger,* 959 S.W.2d at 181; *Yzaguirre,* 47 S.W.3d at 542–43.

■ With respect to the related but different question of whether IKON, at the time the parties executed the Agreements, never intended to perform its contractual obligations under these Agreements, there is no evidence IKON lacked the intent to perform its promises when they were made. "As a general rule, the failure to perform the terms of a contract is a breach of contract, not a tort." *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.,* 823 S.W.2d 591, 597 (Tex.1992). An exception to the general rule arises if a party enters into a contract with no intention of performing; that misrepresentation may give rise to a claim of fraud. *Id.*

Here, IKON provided a written job description, which Eifert found satisfactory. McClusky's and Dinkelacker's pre-acquisition characterizations of the yet-to-be-defined position do not constitute any evidence that IKON never intended to honor the job description as it was subsequently drafted. Similarly, IKON's post-acquisi-

fert, but McClusky did not know what it meant until he (McClusky) talked with Eifert. Finally, Eifert represents McClusky as testifying he would never have offered Eifert the position of CEO of Texas because it would have subsumed one-third of McClusky's own job. In the cited testimony, however, McClusky is referring to Eifert's desire to be CEO of Texas for **both** revenue and non-revenue, not the position as set forth in the job description.

13. Although there was testimony CFOs were not told *to* report to Eifert, there is no evi-

dence CFOs were told *not to* report. Only marketplace presidents were told they would not report to Eifert, and that representation would be consistent with the provision that the position of CEO of Texas was limited to administrative and non-revenue responsibilities.

14. These statements are understandable, given that the ASC was to cover Texas, while the MAC was confined to the Houston market area.

tion conduct does not provide more than a scintilla of evidence IKON did not intend to perform under the Agreements at the time it entered into them. The conduct Eifert cites is not material to the specific promises created by the job description, *i.e.*, Eifert's initial authority over establishment and management of the MAC and the ASC. Although the cited conduct may have been relevant to Eifert's ability to achieve extra contractual goals, those goals are not material to a fraud claim based on the job description.

To the contrary, shortly after the acquisition, Shirley Gassen, an IKON vice president directly under McClusky in the central region and coordinator of all the ASCs, came to Houston to talk with Eifert's personnel about the ASC. In addition, the evidence established Eifert delegated most of the responsibility for the MAC and the ASC to Global employees of Eifert's own choosing. Immediately after the acquisition, Baty was placed in charge of the MAC. According to Baty, "After the MAC, we basically dovetailed into the ASC." Eifert appointed or approved Williams as head of the ASC and Baty as controller of the ASC. Within approximately one year of the acquisition, the MAC had been integrated into the ASC, and the scope of the ASC's responsibility had expanded to include Louisiana.

Even viewing the evidence in the light most favorable to the verdict, we conclude there is no evidence that IKON, at the time it entered into the Agreements, did not intend to perform the specific promises set forth in Eifert's job description.

**c. Global to be a stand-alone company for two years with Eifert as president.** A promise to do an act in the future is actionable fraud when made with no intention of performing the act. *Spoljaric*, 708 S.W.2d at 434. For Eifert to prevail on the stand-alone theory, he had to present some evidence that, at the time IKON promised Global would be a stand-alone company with Eifert as president for two-years, IKON had no intention of performing. *See Formosa Plastics*, 960 S.W.2d at 47–48; *T.O. Stanley Boot*, 847 S.W.2d at 222.

Eifert points to the following evidence of pre-acquisition conduct as supporting fraud based on his stand-alone theory: (1) IKON's not following up on a promise to provide a written job description until after Eifert sent a letter effectively terminating the negotiations; (2) two meetings in which Hollis is told he will be president of Texas; (3) IKON's commencing to consolidate the other Houston dealerships before acquiring Global; (4) Hollis's arranging, in a sublease agreement, an option for expansion space for the Canon sales force, which would come from Global.[15] There is no "logical bridge" between these occurrences and the conclusion IKON, at the time it signed the agreement, did not intend Global to stand alone for two years. *See Lozano*, 52 S.W.3d at 152. Absent this connection, pre-acquisition conduct is irrelevant to whether IKON had no intention of performing the promises in the Agreements when made.

In addition, Eifert points to the following post-acquisition conduct: (1) McClusky's "hint[ing]" and "allud[ing]" in the first few months after acquisition that various pieces of Global be assigned to Hollis and McClusky's specific statement

15. It appears from Hollis's testimony that the sublease was negotiated while Hollis was in the process of merging the eight dealerships IKON had already acquired. Hollis testified the expansion space on the 31st floor "was not signed for right up front. It was an option to expand." The sublease had a conditional expiration date of March 29, 2004. The right to expand to the 31st floor extended for the entire sublease period.

at the November, 1996 meeting; (2) other actions taken at the November, 1996 meeting that transferred portions of Global to other entities, and (3) McClusky's statement in November, 1996 that Eifert had to acquiesce in the changes. This conduct relates to changes made after November 13, 1996—changes that occurred after Eifert himself proposed consolidation of the Houston marketplaces.

In at least two documents, written during the period of late September and early October 1996, Eifert proposed combining IKON and Global into a single marketplace. At the time, however, McClusky was specifically telling the central region presidents he did not want to combine sales and budgets of what were then separate entities. As late as December 5, 1996, Dinkelacker expressed his commitment that Global was to remain intact until September, 1998. Granted, the changes which occurred after Eifert proposed consolidation were not entirely the changes Eifert envisioned. These changes, however, coming when and how they did, constitute no evidence that IKON, when it signed the acquisition agreement, lacked the intention of maintaining Global as a stand-alone company with Eifert as president for two years.

Considering all the evidence in the light most favorable to the jury's verdict, indulging every reasonable inference in favor of Eifert, we conclude there is no evidence that IKON, at the time it entered into the Agreements, did not intend that Global would be a stand-alone company for two years with Eifert as president.

## CONCLUSION

We hold the evidence is legally insufficient to support the jury's finding IKON committed common law fraud against Eifert. Accordingly, we sustain IKON's issue one, reverse the judgment of the trial court, and render judgment Eifert take nothing on his cause of action for common law fraud. Because of our disposition of issue one, we need not address IKON's issues two through six.